**SIERRA CLUB, Jerry Williams, Defenders of the Ouachita Forest, Sherry Balkenhol, Bill Greer, Stan Heard, Plaintiffs,**

v.

**F. Dale ROBERTSON, in his official capacity as Chief, U.S.D.A. Forest Service, John E. Alcock, in his official capacity as Regional Forester, Southern Region, U.S.D.A. Forest Service, John M. Curran, in his official capacity as Supervisor, Ouachita National Forest, Larry Theivagt, in his official capacity as Mena District Ranger, U.S.D.A. Forest Service, George Landrum, in his official capacity as Poteau District Ranger, U.S.D.A. Forest Service, Paul Fuller, in his official capacity as Tiak District Ranger, U.S.D.A. Forest Service, Don Monk, in his official capacity as Oden District Ranger, U.S.D.A. Forest Service, John Archer, in his official capacity as Jessieville District Ranger, U.S.D.A. Forest Service, James Watson,**

---

in his official capacity as Caddo District Ranger, U.S.D.A. Forest Service, Robert Raines, in his official capacity as Womble District Ranger, U.S.D.A. Forest Service, Douglas Webb, in his official capacity as Cold Springs District Ranger, U.S.D.A. Forest Service, Eugene Hayes, in his official capacity as Fourche District Ranger, U.S.D.A. Forest Service, Defendants,

Arkansas Forestry Association, Ouachita National Forest Timber Purchasers Group, and Region 8 Forest Service Timber Purchasers Council, Intervenors.

Civ. No. 90–2150.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Nov. 27, 1991.

596

Mary M. Rawlins, Mena, Ark., for plaintiffs.

J. Michael Fitzhugh, U.S. Atty., and Charles E. Smith, Asst. U.S. Atty., Fort Smith, Ark., and Rebecca A. Donnellan, Environmental and Natural Resources Div., Washington, D.C., for defendants.

Searcy W. Harrell, Jr., Roberts, Harrell & Lindsey, Camden, Ark., Thomas Lund-

quist, Crowell & Moring, Washington, D.C., for timber intervenors.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD, District Judge.

The Sierra Club and others brought suit to enjoin timber sales by the Forest Service in several compartments of the Ouachita National Forest.[1] Plaintiffs asked for a preliminary injunction to stop the sales and enjoin the timber management techniques contemplated as part of these sales. For the reasons explained below, plaintiffs' motion will be denied.

## I.

### A.

■ Intervenor defendants filed a motion for summary judgment premised on plaintiffs' failure timely to appeal the timber decision involving Oden compartment 1030 ("Oden"). In the opinion of this court, plaintiffs' failure to appeal the Oden decision in 1988 must bring to an end the action concerning Oden, for plaintiffs have failed to preserve the right to contest the Oden decision on the merits in this court.

Oden comprises 1,223 acres of National Forest land, 40 acres of which are slated for cutting. This plot of land has been the subject of much study and dispute. In 1988 the Forest Service released a Decision Notice which concluded that harvesting the trees in Oden would be consistent with the 1986 Forest Plan, the requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 ("NEPA"), and the National Forest Management Act, 16 U.S.C. §§ 1600–1614 ("NFMA"). None of plaintiffs filed a timely administrative appeal of the 1988 Decision Notice. After the new Amended Forest Plan became controlling in 1990, the Forest Service released an Environmental Assessment ("EA") Supplement in 1991. The Supplement concluded that the harvest was consistent with the Amended Plan and NFMA requirements,

and that no Environmental Impact Statement specific to Oden was required.

The matter of the Oden appeal, or lack thereof, has come before the court once before, although in a slightly different posture. In a prior motion, plaintiffs sought a preliminary injunction against the Forest Service alleging that plaintiffs had been improperly denied the right to an administrative appeal, and sought to enjoin the Oden and Choctaw timber sales until an administrative appeal could be perfected. The court found that plaintiffs were provided with copies of the Decision Notices and had 45 days in which to appeal, but that no administrative appeal was taken from the original Oden timber sale decision. Because only decisions are appealable, *see* 36 C.F.R. § 217.3, the court also found that the Forest Service's issuance of the Supplement in 1991 was not appealable because it was not a decision. The court therefore concluded that plaintiffs had not been denied an administrative appeal regarding, in particular, the Oden timber sale. *See generally* this court's Order of July 3, 1991.

### B.

"The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law.... The doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969), quoting *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The Eighth Circuit has applied the exhaustion doctrine very strictly, denying relief where plaintiffs fail to perfect or even seek an administrative appeal. *See, e.g., McAlister v. Secretary of the Department of Health and Human Services,* 900 F.2d 157, 158 (8th Cir.1990); *Watson v. Arkansas National Guard,* 886 F.2d 1004, 1008 (8th Cir.1989); *Madsen v. Department of Agriculture,* 866 F.2d 1035, 1037 (8th Cir.1989).

---

**1.** The Ouachita National Forest covers approximately 1,591,849 acres located in twelve west-

central Arkansas counties and two southeast Oklahoma counties.

Needless to say, in light of plaintiffs' lack of timely appeal in this case, a strict application of the exhaustion doctrine would bring a swift halt to the plaintiffs' claims as to Oden.

The Supreme Court, however, has cautioned that the exhaustion doctrine is not to be applied blindly or inflexibly. *McGee v. United States*, 402 U.S. 479, 483, 91 S.Ct. 1565, 1568, 29 L.Ed.2d 47 (1971); *McKart*, 395 U.S. at 200–01, 89 S.Ct. at 1666. The Court has noted the "harsh impact" of the doctrine when it bars judicial review of a litigant's claim. *McGee*, 402 U.S. at 484, 91 S.Ct. at 1568. A trial court must therefore consider whether "the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *West v. Bergland*, 611 F.2d 710, 715 (8th Cir. 1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980). The court should not mechanically recite the broad interests usually served by the doctrine, but must assess the weight of the government's interest by "a discrete analysis of the particular default in question." *McGee*, 402 U.S. at 485, 91 S.Ct. at 1569. In undertaking this discrete analysis, the court should weigh several considerations:

> *McKart* and *McGee* teach that several factors must be weighed, including (1) whether allowing similarly situated litigants to bypass the administrative avenue would seriously impair the agency's ability to perform its function of developing facts and exercising discretion in the first instance; (2) whether allowing judicial review would encourage others to flout the administrative scheme designed by Congress; and (3) whether the circumstances require that the agency be given the first chance to correct its own errors, and to obviate, perhaps, the need for judicial review.

*Madsen*, 866 F.2d at 1039 (Arnold, J., concurring in part, dissenting in part).

Here, the considerations just recited counsel dismissal of plaintiffs' claims. The Forest Service has been deprived of its administrative interest in developing facts and exercising discretion in this case. The agency should have been allowed to perform functions within its special competence, including specialized fact-finding, interpretation of disputed technical subject matter, and resolution of disputes concerning the agency's regulations. *See West*, 611 F.2d at 715. Plaintiffs claim violations of NEPA, NFMA, and Forest Service Regulations involving, *e.g.*, silvicultural inventory requirements, floodplains and wetlands definitions, application of the concept of environmental "diversity," statistical sampling techniques, and use of a computer program called COMPPATS. Hence, the matters before the court involve application and interpretation of technical concepts and complex regulations most appropriately left to the expertise of the Forest Service, at least in the first instance.

Plaintiffs' failure to exhaust denied the agency an opportunity to make a factual record. *See McGee*, 402 U.S. at 484, 91 S.Ct. at 1568. "Permitting the agency to perform its 'trial court' function not only serves interests in administrative autonomy and efficiency but also generally assists ultimate judicial review, if any should be necessary." *West*, 611 F.2d at 716. The failure to submit these matters to the agency first has made this litigation measurably more difficult, unfocused, costly, and lengthy. The agency's compilation of a record would have made subsequent appeals, if any, more efficient because of the agency's expertise in considering technical questions.

The Forest Service, moreover, could have benefitted from plaintiffs' appeal, had one been filed, because it would have had plaintiffs' comments on the agency's actions at a much earlier stage. The agency would have had a chance to consider plaintiffs' concerns and possibly adopt plaintiffs' suggestions, thus obviating the necessity of review. Challenging the agency action in the district court frustrates agency process because the opportunity for agency action has by then already passed. *See id.* Allowing judicial review in this instance, moreover, might encourage others to flout the administrative scheme, because granting an exception here might lead future

plaintiffs to bypass the agency and make their case directly to the district court. Plaintiffs should not be permitted to go over the Forest Service's head and avoid making their case to the agency first; because of the technical nature of the subject matter, these matters are best left to the initial consideration of the Forest Service.

The court is bound, of course, to consider plaintiffs' interests and balance them against the governmental interests just enumerated. *See id.* at 718–20. In doing so, the court must consider the irreparable harm, if any, that will accrue to plaintiffs if the exhaustion doctrine is applied against them. *See id.* In their brief, plaintiffs make their entire substantive case for irreparable harm in one sentence: "In this case, once the timber is sold and cut and the even-aged[2] cut managed for pine, once herbicides are applied, or an area is burned, nothing will replace the diverse forest lost in the process nor the damaged vegetation, waterways and wetlands." Pl. Br. at 3.

Upon reflection, the court finds that plaintiffs' injury is not irreparable as that word is used in this context. Plaintiffs are concerned about the possible loss of "diverse forest," vegetation, waterways, and wetlands, but the record does not show that the Oden sale will irreparably harm any of them. First, there are apparently no wetlands or waterways in the Oden cutting area, for, in the massive record that this case has generated, plaintiffs have not shown that any exist. The Forest Service has elected not to cut near perennial and intermittent streams and has resolved that they "will be managed primarily to maintain water quality." Oden EA Supplement at 4. In fact, the Forest Service will create three wildlife ponds in Oden. *Id.* at 2. Second, plaintiffs have not shown that the harm that will ensue is irreparable, since the record does not reveal that the forest cannot someday be returned to its original state.

In deciding whether irreparable harm has been shown, moreover, a court should consider the pine trees and other vegetation that will grow, and the game species that will benefit from clearing the undergrowth, in addition to the particular gum trees that will be cut down. In other words, a court ought to examine the record to determine whether it shows that a net harm will occur. Although some vegetation will be removed, the vegetation will be replaced: Some trees will be cut; new trees will grow in their place. Some prescribed burning is planned to enhance wildlife habitat, and there is evidence that the animals hunters pursue will thrive in the wake of the harvest. The court cannot conclude that any net harm will ensue from the Forest Service's contemplated activities. Plaintiffs have assumed in this case the role of quintessential conservatives, preferring no changes whatever in the Ouachita National Forest. For plaintiffs, irreparable harm results when any gum tree is cut or road is built. Plaintiffs' wish, however, collides with the multiple uses that Congress has endorsed for the national forests in NFMA.

Diversity is a requirement of NFMA, moreover, and pursuant to this requirement the Forest Service has considered diversity in the Oden sale. According to NFMA, the Forest Service must create regulations to provide for the diversity of plants and animals. The regulations must provide, "where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan." 16 U.S.C. § 1604(g)(3)(B); *see* 36 C.F.R. § 219.27(b). A review of the Oden EA and Supplement demonstrates that the Forest Service considered diversity in the Oden compartment specifically. *See generally* Oden EA and EA Supplement; *see also infra*, Section IV.B.5. The Forest Service has considered diversity at both the forest plan and compartment level and has planned for its preservation, and therefore no irreparable harm to diversity should result.

The court must also consider the fairness of requiring exhaustion under the particular circumstances. *Madsen*, 866 F.2d at

---

**2.** *See infra,* n. 5.

1039–40 (Arnold, J., concurring in part, dissenting in part). The sound reasons for requiring exhaustion in this timber sale decision have already been reviewed. Furthermore, plaintiffs have given no reason why they did not pursue administrative remedies when they were available, and the record shows they were notified that such remedies were available. Thus, it is fair to impose the rule of exhaustion in the case of timber sales in the Oden compartment.

## II.

■ Intervenor defendants have also asked for judgment regarding plaintiffs' challenge of another timber sale, for, they claim, plaintiffs have preserved only one issue for review by this court. Choctaw compartments 92, 93, and 94 ("Choctaw") comprise 4,448 acres in the Northwest Walker Mountain Area near Heavener, Oklahoma. In Choctaw, the Forest Service has planned 61 acres of timber harvesting with shelterwood and seedtree regeneration[3] and 87 acres of prescribed burning to improve wildlife habitat, but no herbicide use. In 1990 the Forest Service released a Decision Notice, EA, and Finding Of No Significant Impact ("FONSI") that concluded that harvesting the trees in Choctaw would be consistent with the 1986 Forest Plan, NEPA, and NFMA. One of plaintiffs, Cliff Rushing, a Sierra Club member, filed a timely administrative appeal of the Choctaw Decision Notice. After the new Amended Forest Plan became controlling in 1990, the Forest Service released an EA Supplement in 1991, which concluded that the timber management scheme was consistent with the Amended Plan, NEPA, and NFMA requirements, and that no Environmental Impact Statement specific to Choctaw was necessary.

■ Although an administrative appeal of the Choctaw decision was perfected, the principle of exhaustion applies to the plaintiffs' claims regarding the Choctaw compartments as well. Mr. Rushing appealed six issues,[4] only one of which, the NFMA diversity requirement, is now before the court. This court must decline to hear issues not raised in the administrative appeal for the reason that

> orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.... Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

3. *See infra,* n. 5.

4. Only the diversity requirement is validly a part of the instant lawsuit. In his administrative appeal, Mr. Rushing raised the following issues: (1) whether the decision adequately addressed the trade-offs involving tourism, recreation, and the quality of life; (2) whether the decision considered the impacts, including the cumulative impacts, that the proposed action will have on diversity; (3) whether the proposed action's direct and cumulative effects on soil, water, and site productivity were adequately analyzed and disclosed; (4) whether seed-tree cutting is the "appropriate" harvest cutting method under the NFMA; (5) whether the decision adequately considered the effects of even-aged management on deer and turkey; and (6) whether the public input was considered in developing the EA and the Decision Notice. *See* Statement of Reasons for Appeal, Letter from Mr. Rushing to Mike Curran, Forest Supervisor,

Ouachita National Forest; Regional Forester's Second–Level Appeal (reviewing decision of Forest Supervisor). He also raised other objections which did not meet Forest Service specificity requirements. *See* Regional Forester's Second–Level Appeal.

It is arguable that Mr. Rushing's contentions regarding water runoff are closely related to the wetlands and floodplains arguments made in the instant action. Mr. Rushing argues:

> 5. Increased water yield will damage the creeks and drainages. In conjunction with past and present activities this will cause violations of the Clean Water Act and the EPA antidegradation policy.

Statement of Reasons for Appeal, Letter from Mr. Rushing to Mike Curran, Forest Supervisor, Ouachita National Forest. While this argument is related to one claim plaintiffs present here, it is premised on a different legal theory and hence not sufficiently related to credit plaintiffs with having administratively appealed the issue.

*United States v. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). Generally speaking, failure to raise an issue in the administrative appeals process precludes the district court from hearing the merits of that issue. *See Arp v. Railroad Retirement Board,* 850 F.2d 466, 467 (8th Cir.1988). This principle applies, of course, to issues not raised in an appeal from Forest Service actions. *See National Forest Preservation Group v. Butz,* 485 F.2d 408, 411 (9th Cir.1973). Therefore, this court needs to review on the merits only the diversity claim regarding Choctaw, for it is the sole issue preserved for review. *See* Section V, *infra.*

## III.

The foregoing analysis is sufficient to dispose of plaintiffs' motion, with the exception of their diversity claim with respect to Choctaw. The court, however, will address the entirety of plaintiffs' motion for preliminary injunction on the merits, for the sake of completeness and efficiency, in order to arrive at an alternative holding.

## A.

■ Although plaintiffs applied to this court for a preliminary injunction, the issue before this court is not whether a preliminary injunction should issue, but whether the Forest Service's Oden and Choctaw timber sales decisions pass muster under an arbitrary and capricious standard of review. *See Cronin v. United States Department of Agriculture,* 919 F.2d 439, 445 (7th Cir.1990). The injunction that plaintiffs seek is not preliminary to anything, because plaintiffs are not entitled to a hearing on a motion for permanent injunction; the record is complete and this case merely involves the review of that administrative record. The plaintiffs had requested a hearing to produce evidence in support of their motion for preliminary injunction. No hearing was held, however, because such a hearing was and is unnecessary. "[T]he district court must ... determine the merits of Sierra Club's claims by focusing on the administrative record on which the agency based its decision, not on some new record compiled initially in the

reviewing court." *Sierra Club v. United States Army Corps of Engineers,* 771 F.2d 409, 413 (8th Cir.1985). The district court's review is limited to the record before the agency. "In such a suit the district court is a reviewing court, like [the appellate] court; it does not take evidence." *Cronin,* 919 F.2d at 443. "A federal court is confined to the administrative record ... unless the plaintiff can make a 'strong showing of bad faith or improper behavior.'" *Maxey v. Kadrovach,* 890 F.2d 73, 77 (8th Cir.1989) (*per curiam*), *cert. denied,* 495 U.S. 933, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990), quoting *Corning Savings and Loan Association v. Federal Home Loan Bank Board,* 736 F.2d 479, 481 (8th Cir.1984). No such showing was made here. Plaintiffs, therefore, are simply entitled to have the district court review the administrative record upon which the Forest Service based its decision and determine whether, applying an arbitrary and capricious standard, the agency action was legal. *Cronin,* 919 F.2d at 443–45.

■ Regarding the technical questions now confronting this court, trained agency specialists are better equipped to select, hear, digest, and weigh the relevant evidence. For this reason, "it is imprudent for the generalist judges of the federal district courts ... to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency." *Id.* at 444. If the agency acted improperly, the remedy "is to order the agency to hold a proper hearing—not for the court to hold the hearing itself." *Id.* This court's task is not to weigh the evidence independently and reach its own findings. The role of the reviewing court is to ensure that the agency takes a "hard look" at the environmental consequences of its actions, and the court must not substitute its own judgment for that of the agency. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). As the Supreme Court has said:

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or

if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power and Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).

### B.

Before reviewing the history of the specific timber sales at issue and the resulting dispute, it would be useful to review the regulatory scheme. In rendering a timber sale decision, the Forest Service must give effect to numerous statutes, regulations, and executive orders. Congress passed NEPA and NFMA, and to these schemes of complex rules the executive branch has added additional layers. For example, the Council on Environmental Quality has issued regulations enforcing NEPA ("NEPA Regulations") and the Forest Service has issued regulations enforcing NFMA ("NFMA Regulations"). In addition, two Executive Orders address floodplains and wetlands.

NEPA requires an Environmental Impact Statement ("EIS") from agencies contemplating "major" actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). NEPA also requires consideration of the following: The unavoidable adverse environmental effects of a proposed action; possible alternatives to the action; the relationship between short-run effect on the environment versus the long-run impact on productivity; and any irreversible and irretrievable commitments of resources effected by the action. 42 U.S.C. § 4332(2)(C)(ii)–(v). NEPA Regulations also apply to the EIS process. *See, e.g.,* 40 C.F.R. §§ 1501.4, 1502, and 1508.11. In order to determine whether an action might have a significant impact on the environment, an agency will often prepare the more limited EA. Creation of an EA is governed by certain NEPA Regulations. 40 C.F.R. §§ 1501.2–1501.4. Only if the EA finds a significant impact would an EIS be required. If the

EA finds no significant impact, the agency then issues a FONSI. 40 C.F.R. § 1508.13.

NFMA is also of importance to the timber harvesting regulatory scheme. NFMA requires the Forest Service to develop land and resource management plans for units of the National Forest System. 16 U.S.C. § 1604(a). For each unit of the National Forest System, an interdisciplinary team prepares an integrated plan based on "inventories" of forest resources. In NFMA, Congress directed the Forest Service to write regulations encompassing manifold purposes, including placing limits on the harvesting of timber on federal land administered by the Forest Service.

Each national forest has its own NFMA forest plan and its own EIS. The EIS in such a case is "programmatic" because it is issued along with the NFMA-mandated forest plan. *See Ventling v. Bergland,* 479 F.Supp. 174, 176 (D.S.D.1979), *aff'd without opinion,* 615 F.2d 1365 (8th Cir.1979) ("The concomitant EIS [issued with the Plan] is therefore of the 'programmatic' variety required when a series of actions will have a cumulative or synergistic environmental impact"). In this case, therefore, the court must consider not merely an EIS, but a programmatic EIS for the whole Ouachita forest and the concomitant EA evaluating the individual timber sale. The programmatic EIS here is called the FSFEIS.

The programmatic nature of the FSFEIS is significant. Although NEPA requires an EIS for every project significantly affecting the environment, the Eighth Circuit has noted that a well-prepared programmatic EIS may obviate the need for a particularized, site-specific EIS:

We are of the view that upon consideration of the overall timber management policy of the Forest Service in an EIS complying with NEPA, each administrative action taken pursuant to that policy will not require a separate impact statement. In other words, if the environmental effects of timber cutting are considered in the overall EIS, an individual EIS for each timber sale would not be required, absent a material change in

circumstances or a departure from the policy covered in the overall EIS. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1323 n. 29 (8th Cir.1974) (*en banc*). "Although a programmatic EIS may often be inadequate relative to an individual action, there is no reason to require a site-specific statement that would merely duplicate the programmatic EIS." *Ventling*, 479 F.Supp. at 179; *see also Cronin*, 919 F.2d at 447 ("once an environmental impact statement has been issued for a project, the project can be carried out without the agency's having to issue a new statement for every stage of the project"). NEPA Regulations require a subsequent EIS only when significant environmental impacts were not adequately evaluated in the programmatic statement. 40 C.F.R. § 1502.9(c)(1). The Forest Service may use an EA to evaluate whether the project is consistent with the programmatic EIS and whether another EIS is necessary. *See* 40 C.F.R. § 1508.9(a).

### C.

Plaintiffs want to restrain the Forest Service from "even-aged management" [5] of the Oden and Choctaw compartments of the Ouachita National Forest, and from damaging threatened or endangered species, Arkansas "sensitive species," floodplains, or wetlands. Plaintiffs have alleged a laundry list of Forest Service mistakes, irregularities, and studied ignorance which they claim render invalid the federally-mandated studies and plans that the Forest Service has produced in support of its decision to harvest timber by even-aged management.

In 1986 the Forest Service approved the final land and resource management plan for the Ouachita National Forest ("1986 Plan") pursuant to NFMA and released an accompanying final environmental impact statement ("1986 FEIS") pursuant to NEPA. In 1990 the Forest Service approved an amended land and resource management plan ("Amended Plan") which superseded the 1986 Plan, and issued a final supplement to the 1986 FEIS ("FSFEIS"). Some of the plaintiffs filed an administrative appeal to the Forest Service Chief regarding the Amended Plan and FSFEIS. The Forest Service Chief upheld both the Amended Plan and the FSFEIS in an appeal decision dated April 14, 1991.

In 1990, the Forest Service released a final EIS analyzing vegetation management alternatives for the Ouachita, Ozark, and St. Francis National Forests ("VMFEIS") and selected a vegetation management program pursuant to a record of decision ("VMROD"). The VMROD amends the Ouachita Plan's approach to herbicide use. Some plaintiffs filed an administrative appeal of the VMFEIS and the VMROD to the Forest Service Chief. The Chief upheld the VMFEIS and VMROD in an appeal decision dated April 16, 1991.

As noted earlier, Oden comprises 1,223 acres of National Forest land, located near the town of the same name in west-central Arkansas. In Oden, the Forest Service plans to allow timber harvesting by the shelterwood method on 40 acres with concomitant road construction, 122 acres of timber thinning to control the number of trees per acre, and other wildlife and timber stand improvement. Herbicides will be used where trees were harvested previously.

In 1988 the Forest Service released an EA for Oden 1030 corresponding to the 1986 FEIS, and a Decision Notice that concluded that the harvest would be consistent

---

5. Even-aged management is a timber harvesting scheme in which the trees are encouraged to grow at an even height and age so as to make it possible to harvest a more standard length of tree. *See* 36 C.F.R. § 219.3. This is usually accomplished by one of three techniques: clearcutting, seedtree cutting, or shelterwood cutting. Clearcutting occurs when all the trees are cut at once so new trees will begin growing simultaneously and will be roughly the same age. Seedtree cutting involves harvesting nearly all the timber in a selected area in one cut, but a few of the better seed-producing trees are left to reseed naturally and regenerate the stand. The shelterwood cutting technique uses partial cuts to remove the mature stand in sections over a period of years; the final cut removes the last shelter and allows the stand to develop as an even-aged stand. All three methods are NFMA-approved methods of harvesting timber, provided that certain conditions are met. *See* 16 U.S.C. § 1604(g)(3)(F).

with the 1986 Plan and the requirements of NFMA. The final EA concluded that no EIS was required; in other words, it made a finding of no significant impact. After the forest plan was amended, the Forest Service released an EA Supplement in 1991. The EA Supplement concluded that the harvest was consistent with the Amended Plan and NFMA requirements and, again, that no new EIS was required.

As mentioned previously, the Choctaw cut is in a set of compartments near Heavener, Oklahoma. The Forest Service has planned to cut 61 acres of timber and to regenerate a pine forest through the shelterwood and seedtree methods. The agency will burn off undergrowth to improve wildlife habitat, but there will be no herbicide use. In 1990 the Forest Service released a Decision Notice, EA, and FONSI, and when the new Amended Forest Plan became controlling in 1990, the Forest Service released an EA Supplement. As was the case with Oden, the EA Supplement concluded that the Forest Service's decision was consonant with the Amended Plan, NEPA, and NFMA requirements, and that no Environmental Impact Statement was necessary.

## IV.

### A.

▆▆▆ The scope of review of an agency decision is a narrow one, for the court must simply determine whether the Forest Service took a "hard look" at the relevant factors and reached a decision that was neither arbitrary nor capricious. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 416, 91 S.Ct. 814, 822, 823, 28 L.Ed.2d 136 (1971). *"Marsh* establishes that when an agency determines not to prepare an EIS based on its review of the environmental impact of a project, as when it has already prepared an EA and issues a finding of no significant impact, a reviewing court reviews that determination under the arbitrary and capricious standard." *Goos v. Interstate Commerce Commis-*

*sion,* 911 F.2d 1283, 1292 (8th Cir.1990). There is no doubt, moreover, that the arbitrary and capricious standard applies to NFMA review as well. "A decision to pursue even-aged management as the over-all management plan under the NFMA is subject to the narrow arbitrary and capricious standard of review." *Texas Committee on Natural Resources v. Bergland,* 573 F.2d 201, 212 (5th Cir.1978), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978). The review under the arbitrary and capricious standard considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861, quoting *Citizens to Preserve,* 401 U.S. at 416, 91 S.Ct. at 824. "This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Id.*

▆▆▆ In addition, some of plaintiffs' concerns involve statutory or regulatory interpretation. The court must defer to the Forest Service's construction of the statute it administers, unless the plain statutory language is to the contrary. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). In particular, where the legal issue is the meaning of the Forest Service's own regulations, the agency's interpretation is controlling where it is not plainly erroneous or inconsistent with the regulation. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 1850, 104 L.Ed.2d 351 (1989). Finally, although the court must engage in a "'thorough, probing, in-depth review,'" the Forest Service's actions are entitled to a "'presumption of regularity.'" *See Ringsred v. Dole,* 828 F.2d 1300, 1302 (8th Cir.1987), quoting *Citizens to Preserve,* 401 U.S. at 415, 91 S.Ct. at 823.

### B.

Plaintiffs advance five arguments in support of their prayer for an injunction. First, they assert that the EIS based on the 1986 Plan, the FSFEIS based on the 1990 Amended Plan, and the Oden EA and EA

Supplement violate standards set by NEPA. Second, they claim that the Forest Service has violated an NFMA provision, 16 U.S.C. § 1604(g)(3)(F), that plaintiffs argue requires that the effects of even-aged timber harvesting be assessed separately from other actions planned in the sale area. Third, they aver that the Forest Service violated the inventory requirements of NFMA. Their fourth claim is that the Forest Service violated Executive Orders 11988 and 11990, NFMA, and NFMA Regulations in defining wetlands and floodplains. Finally, plaintiffs maintain that the Forest Service disregarded NFMA requirements to preserve diversity. Each of these claims will be discussed in turn.

### 1. NEPA Violations

■ Plaintiffs claim that the FSFEIS based on the 1990 Amended Plan, and the Oden EA and EA Supplement, are inadequate to allow the agency to proceed with the Oden timber sale. In particular, plaintiffs argue that neither the EA nor the EIS contains sufficient information for the Forest Service properly to decide between a finding of significant impact for the timber sale at issue. Pl. Br. at 9–13. Plaintiffs seem to claim that an EIS analyzing site-specific consequences is necessary for each timber sale decision such as Oden. Pl. Br. at 9–12.

■ This conclusion seems to the court to be clearly wrong. Rather, the court must determine whether the EIS contemplated the kinds of timber harvesting covered by the EAs, and whether the timber cutting described in the EIS differs significantly from the timber cutting in the EAs, either because the circumstances or the policy changed. NEPA requires federal agencies contemplating a major federal action significantly affecting the quality of the human environment to prepare a "detailed statement" discussing the following five procedural considerations: (1) the environmental impact of the proposed action; (2) any adverse economic effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved if the proposed action should be implemented.[6] 42 U.S.C. § 4332(2)(C). The test of compliance is good-faith objectivity. *Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292, 1300 (8th Cir.1976) (*en banc*), cert. denied, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977). The EIS need contain only sufficient information to permit a reasoned choice of alternatives; the discussion of environmental effects and alternative courses of action need not be exhaustive, but must neither be vague, general, nor conclusory. *Id.* Furthermore, NEPA does not require an objection-free document, but a decision-making tool. *Id.*

The shelterwood technique contemplated for Oden was anticipated in the FSFEIS. *See, e.g.,* FSFEIS at II–60 (Preferred Alternative W). Hence, the Oden EA is consistent with the FSFEIS. Furthermore, each of the five areas required by 42 U.S.C. § 4332(2)(C) was discussed in the FSFEIS. *See* FSFEIS at IV–1 to IV–53 (the environmental impact of the proposed action), IV–58 (adverse economic effects which cannot be avoided should the proposal be imple-

---

**6.** The "detailed statement" requirement serves at least three purposes:

First, it requires an agency to compile an environmental record from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect.... To accomplish this, the statement must not merely catalog environmental facts, but also explain fully its course of inquiry, analysis and reasoning.... Second, the statement serves as an environmental full disclosure tool by providing information ... about the environmental costs involved in a particular project.... Third, the "detailed statement" requirement ensures the integrity of the process by requiring *reasoned* analysis in response to conflicting data or opinions on environmental issues.... The detailed statement serves to gather in one place a discussion of the relative impact of alternatives so that the reasons for the choice of alternatives are clear. It thus precludes having stubborn problems swept under the rug by responsible agencies.

*Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292, 1299–1300 (8th Cir.1976) (*en banc*), cert. denied, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977) (emphasis in original).

mented), II–1 to II–93 (alternatives to the proposed action), IV–53 to IV–56 (relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity), and IV–56 to IV–58 (irreversible and irretrievable commitments of resources which would be involved if the proposed action should be implemented). The Forest Service produced a reasoned analysis of the relevant considerations in its survey of timber-cutting plans in the Ouachita National Forest.

Nothing appears to be arbitrary or capricious in the Forest Service's documentation of NEPA concerns. Rather, the FSFEIS appears to be a good-faith analysis of the relevant environmental matters. The EA conforms to NEPA Regulations requiring only "brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). It describes the timber sale area, alternatives to the proposed action, and the environmental consequences of each alternative. In particular, the EA discusses the environmental impact on plant and animal diversity, water quality and soil productivity, the use of herbicides, and the effect of new roads. The alternatives considered included no activity, clearcutting, uneven-aged management, and two options which consisted of a mixture of even-aged and uneven-aged techniques. Through the use of "tiering,"[7] the more detailed discussions in the FSFEIS have been incorporated by reference. *See* Oden EA Supplement at 2. Upon reviewing both the FSFEIS and Oden EA, it appears to the court that the EIS and EA provide the information reasonably necessary to enable the decision-maker to consider environmental consequences and to make a reasoned decision.[8]

■■■ The burden is on plaintiffs to show that specific environmental issues requiring an EIS were ignored in the EA, or their claim must fail. *See Olmstead Citizens for a Better Community v. United States,* 793 F.2d 201, 204 (8th Cir.1986). Here, plaintiffs have not shown that the timber cutting described in the EIS differs significantly from the timber cutting in the EAs, either because the circumstances or the policy changed. Plaintiffs have not shown that the FSFEIS did not anticipate the even-aged management scheme contemplated in the Oden sale, or that Oden differs from the rest of the forest analyzed in the FSFEIS. Plaintiffs have failed to raise specific shortcomings in the EA sufficient to overcome the deferential arbitrary and capricious standard of review. Nor have the plaintiffs persuaded the court that the FSFEIS and the EA do not supply the information reasonably necessary to enable a decision-maker to consider environmental consequences and to make a reasoned decision.

### 2. Separate Assessments of Even–Aged Harvesting

■■■ Plaintiffs advance two arguments that the Forest Service misapplies NFMA's

---

**7.** Environmental Impact Statement—Tiering:

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.-28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions.

40 C.F.R. § 1502.20; *see also* 40 C.F.R. § 1508.28 (Terminology and Index—Tiering).

**8.** The court makes this conclusion based on its review of the discussions in each document and the requirements of NEPA. Plaintiffs appear to make their claim of inadequacy based on claims also made separately in their brief, and addressed separately in· this opinion *infra, e.g.,* inventory requirements and separate assessments of even-aged harvesting. To the extent plaintiffs' claims of inadequate information are based on these considerations, the court has addressed them elsewhere.

prerequisites for even-aged management, 16 U.S.C. § 1604(g)(3)(F). First, plaintiffs aver that the EAs violate NFMA because they do not separately address the environmental effects of the even-aged timber harvest itself, apart from other effects of concurrent actions within that compartment, such as prescribed burning. Pl. Br. at 19. In an EA, the Forest Service analyzes alternatives which may include even-aged management, along with, *e.g.*, building ponds, rather than the effects of the even-aged treatment alone.

Second, plaintiffs protest that the agency correctly considers the "appropriateness"[9] of the management method for the *stand* of trees to be cut, but applies the other four requirements of U.S.C. § 1604(g)(3)(F) to the larger *compartment* of trees which contains the stand.[10] Pl. Br. at 16–18. The agency should instead, plaintiffs appear to argue, apply each clause of 16 U.S.C. § 1604(g)(3)(F) to the stand.

Despite plaintiffs' suggestion, however, there is no specific requirement in NFMA that a separate analysis be made of the even-aged technique itself, or that the other clauses of 16 U.S.C. § 1604(g)(3)(F)(ii)–(v) must apply to the stand rather than the compartment. Plaintiffs' reading of the statute is creative, and the court understands plaintiffs' argument that the agency applies the statute unevenly, but the court concludes that the Forest Service is entitled to its interpretation.

The Forest Service administers NFMA. The standard of review is especially deferential when a court reviews an agency's construction of a statutory scheme under its care. *See Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–83. "The NFMA is a set of outer boundaries within which the Forest Service must work. Within its parameters [*sic*], the management decision be-

longs to the agency and should not be second-guessed by a court." *Texas Committee*, 573 F.2d at 210. The Forest Service has not read into NFMA a requirement that even-aged cutting be assessed separately from other environmental effects, nor does it believe that it need apply the NFMA provisions evenly between the stand and the compartment. Plaintiffs' statutory preference has not been adopted by the Forest Service, and will not be adopted by this court because the Forest Service is not clearly wrong. Upon reviewing the EA and FSFEIS, moreover, the court is convinced that the Forest Service has correctly applied the provisions of 16 U.S.C. § 1604(g)(3)(F) as it has interpreted them.

3. Inventory Requirements of NFMA

 Plaintiffs argue that certain inventory deficiencies exist in the Forest Service's data. They assert that the Forest Service erred in (1) basing inventory on the canopy instead of the forest floor, which overestimates pines to the disadvantage of other trees; (2) improperly determining the age of the stand; (3) failing to inventory rare and endangered species and Arkansas "sensitive species"; (4) failing to inventory plant species; and (5) producing an inventory that is basically a "timber inventory." Pl. Br. at 22–27. The purpose for this attack on the inventory methodology appears to be that the inventory information is "an insufficient basis for the determination of the appropriateness of even-aged practices." Pl. Second Amended Complaint at 21–22.

 Plaintiffs' claim must fail because the Forest Service has considerable discretion in inventorying and plaintiffs have failed to persuade the court that the inventory has shortcomings that clearly violate the arbitrary and capricious stan-

---

**9.** Regulations must "insure that ... seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where ... it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan." 16 U.S.C. § 1604(g)(3)(F)(i).

**10.** The regulations must also ensure that timber will be harvested only where (1) the soil, slope or other watershed conditions will not be irreversibly damaged; (2) lands can be adequately restocked within five years of harvest; (3) protection can be provided for wetlands; and (4) the harvesting system is not selected primarily for maximum dollar return or output of timber. *See* 16 U.S.C. § 1604(g)(3)(E).

dard.[11] NFMA merely requires that a forest plan be "based on inventories of the applicable resources of the forest," 16 U.S.C. § 1604(f)(3), and that the Forest Service must issue regulations to "provide for obtaining inventory data on the various renewable resources," 16 U.S.C. § 1604(g)(2)(B). Under the section "Forest Planning—Process," the NFMA Regulations require each Forest Supervisor to

> obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction. The Supervisor will assure that the interdisciplinary team has access to the best available data.... Data shall be stored for ready retrieval and comparison and periodically shall be evaluated for accuracy and effectiveness.... As information is recorded, it shall be applied in any subsequent planning process.

36 C.F.R. § 219.12(d). By specifying "best available data," it appears that the regulation intends that the interdisciplinary team have access to the best data available in the agency, not some ideal type of data, because the EA is supposed to be brief, 40 C.F.R. § 1508.9, and "low-budget," *Cronin v. United States Department of Agriculture,* 919 F.2d 439, 443 (7th Cir.1990). NEPA, as well, does not "specify the quantum of information that must be in the hands of a decisionmaker." *Alaska v. Andrus,* 580 F.2d 465, 473 (D.C.Cir.1978), *vacated in other part,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978). Of course, the Forest Service, as an agency of trained specialists, must have the discretion to determine what the best information is.

Plaintiffs attack the Continuous Inventory of Stand Condition database, the COMP-PATS computer simulation program, and the Forest Service's methodology in compiling the inventory. Pl. Br. at 25; Pl. Third Amended Motion at 10. Specifically, plaintiffs argue that the inventory information is inadequate because it "does not scientifically sample among all trees on the stand" and "does not agree with the best information available." Pl. Br. at 25. They assert that the inventory is biased in favor of counting the taller trees and pine trees in particular. *Id.* They also assert that the Forest Service failed adequately to inventory wetlands, floodplains, and watersheds, as well as threatened, endangered, and sensitive species. *Id.* at 24–27.

Based on the record, plaintiffs' claims are unpersuasive. Indeed, there are no wetlands, floodplains, or watersheds in the cutting area,[12] and the EA Supplement in fact discusses the presence of threatened, endangered, and sensitive species. Oden EA Supplement at 6–7, 10–11, and appendices. As for vegetation, plaintiffs merely claim that other studies disagree with those of the Forest Service. It is most evident that plaintiffs *disagree* with the Forest Service, but that is not enough. Plaintiffs' arguments succumb to the discretion that the Forest Service must and in fact does possess in order to create an inventory of a multi-million-acre forest.

The scientific nature of this inventory dispute, moreover, appeals to this court's sense of caution. Even if plaintiffs' assertions were persuasive—and they are not—this court may not substitute its judgment on scientific methodology for that of the Forest Service. "When specialists express competing views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861. It is not this court's function to resolve disagreements between experts or to judge the merits of competing views. *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 496 (9th Cir.1987). Therefore, "[t]his court de-

---

**11.** It is necessary to emphasize again that the Forest Service administers NFMA, and that the standard of review is especially deferential when reviewing an agency's construction of a statutory scheme under its care. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). An agency's interpretation of its own regulations, moreover, must be accorded "great deference." *See Moore v. Custis,* 736 F.2d 1260, 1262 (8th Cir.1984).

**12.** *See infra,* subsection 4.

clines [plaintiffs'] invitation to serve as the second at a duel between expert opinions." *Village of Palatine v. United States Postal Service,* 756 F.Supp. 1079, 1086 (N.D.Ill. 1991).

4. Wetlands and Floodplains Regulations

▪ Plaintiffs assert numerous Forest Service definitional errors regarding wetlands and floodplains. They claim that the Forest Service has defined the floodplain the same as a riparian zone in the EIS and EAs, and that the floodplain is not specifically considered in the FSFEIS. They also argue that the Forest Service has represented increased water yields from timber harvesting as a benefit in order to favor even-aged management. Pl. Br. at 27–32. Plaintiffs assert, moreover, that the Forest Service has failed to comply with Executive Orders regarding definition of wetlands. In addition, plaintiffs claim that the misdefinitions are also violations of both NFMA, *see* 16 U.S.C. §§ 1604(g)(3)(A), 1604(g)(3)(E)(i), 1604(g)(3)(E)(iii), and Forest Service Regulations, *see* 36 C.F.R. §§ 219.23(c), 219.23(f). Pl. Br. at 32–35.

Although the considerations addressed in the inventory claims might well apply here, there is a more fundamental difficulty with plaintiffs' water-related claims, because the Forest Service concluded that Oden contains neither wetlands nor floodplains. Oden Decision Notice at 4; Oden EA Supplement at 7; Oden FONSI at 13, para. 2. Indeed, plaintiffs adduce no proof of floodplains or wetlands in the Oden compartment, but merely presume their existence. In fact, the timber sale area does not include the perennial and intermittent streams in the area, which will henceforth be managed primarily to maintain water quality. Oden EA Supplement at 4. Because there is no showing whatsoever that the Forest Service's definitions or misdefinitions are relevant to plaintiffs' motion for injunctive relief, such arguments cannot serve as a basis for enjoining the Oden timber sale.

5. Diversity

▪ Finally, plaintiffs claim that the Forest Service has not adequately analyzed the effect on the diversity [13] of plants and animals in reaching its decision to harvest by even-aged methods in Oden. Plaintiffs maintain that diversity studies must be made within the compartment for sale. Pl. Br. at 37. NFMA directs, in well-qualified clauses, the Forest Service to write regulations to provide for the "diversity" of plants and animals to meet "multiple-use objectives" and also to provide, "where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan." 16 U.S.C. § 1604(g)(3)(B). The corresponding regulations may be found at 36 C.F.R. § 219.27(g). NFMA does not appear to require diversity in the sale compartments, but only at the plan level. *See* 16 U.S.C. § 1604(g)(3)(B). NFMA Regulations define diversity "within the area covered by a land and resource management plan," 36 C.F.R. § 219.3, or in the "planning area," 36 C.F.R. §§ 219.26, 219.27(g). Thus the requirement seemingly operates at the National Forest level, not the compartment level. (One subsection does require that "diversity shall be considered throughout the planning process," 36 C.F.R. § 219.26, which would suggest consideration of diversity at the lower levels of the national forest, *i.e.,* in the compartments.) But in any event, the Forest Service has considered diversity at both the plan and the compartment level. The Amended Plan discusses diversity at IV–14 through IV–22, as does the FSFEIS in Appendix F. A review of the EA demonstrates that the Forest Service considered diversity in the Oden compartment specifically. *See generally* Oden EA and Supplement.

Plaintiffs also fear that even-aged management will create a pine forest monoculture in Oden. Pl. Br. 37–39. The court, after reading the administrative record, believes this fear to be unfounded. For example, the Oden EA Supplement re-

---

**13.** "Diversity" is defined at 36 C.F.R. § 219.3: "The distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan."

quires, consistent with the Amended Plan, that at "least 20% of this Compartment will be designated and managed for hardwood" and that "[a]ll stands managed for pine will include provisions for the retention of a 10–30% hardwood component." Oden EA Supplement at 4. In sum, plaintiffs fail to demonstrate that their fears of type conversion or loss of diversity are warranted.

## V.

In order to stop even-aged management in Choctaw, plaintiffs advance the same five arguments in support of their prayer for an injunction against the timber sale in that compartment. To recapitulate, they are: (1) the failure of the EIS, EA, and EA Supplement to follow standards set by NEPA; (2) the violation of the NFMA provision that plaintiffs argue requires that the effects of even-aged timber harvesting be assessed separately from other actions planned in the sale area; (3) the disregard of the inventory requirements of NFMA; (4) the improper definition of wetlands and floodplains; and (5) the failure to preserve diversity. The court need not review each of these matters in the same depth as above. Only those relating to NEPA, wetlands, and diversity must be examined with regard to Choctaw, because plaintiffs' reading of NFMA and the inventory requirements has already been addressed and resolved.

### 1. NEPA Violations

■ Regarding NEPA standards, the court must determine whether the timber cutting described in the Choctaw EA and EA Supplement differs significantly from the timber cutting dealt with in the EIS, because either the circumstances or the policy have changed. Upon consideration of the record, the court concludes that the seedtree and shelterwood regeneration scheme selected for Choctaw was contemplated and analyzed in the FSFEIS. *See, e.g.*, FSFEIS at II–60. Hence, the decision to use these methods in Choctaw is consistent with the FSFEIS. Plaintiffs' general

(and rather vague) argument that the information in the FSFEIS, the EA, and the EA Supplement is inadequate or incomplete is not evident upon a review of the record. The Forest Service, to whose expertise this court must defer, has selected the information, and the information upon which it bases its decision in Choctaw does not appear arbitrary and capricious to this court. Therefore, plaintiffs have failed to raise a substantial environmental issue requiring a site-specific EIS.

### 2. Wetlands and Floodplains Regulations

■ Although there is some water in the Choctaw compartment, it has been excluded from the timber-cutting area. The EA Supplement states:

> Mitigation measures are applied to protect ephemeral and intermittent stream zones by removing all these areas from the commercially suited timber land base of this analysis area. All intermittent and ephemeral streams that can be depicted on maps attached in appendix A of the EA have been made separate stands and classified as non-commercial. This is in accordance with standards 9.60, 9.72, and Tables IV–14 and IV–15 of the [Amended Plan].

Choctaw EA Supplement at unnumbered page 7. There are no affected wetlands (other than the aforementioned streams) in the Choctaw area. Choctaw EA at unnumbered page 7; Decision Notice at unnumbered page 3, # 6. Plaintiffs nowhere dispute that the Forest Service removed the water sources from the cutting area, or that a change in the floodplains or wetlands definitions would make any difference, material or otherwise, that would affect the validity of the agency's decision. Rather, they appear to request the court to rule as a matter of law that the definitions of wetlands and floodplains are legally deficient.[14] The court declines to give an advisory opinion on this matter.

---

**14.** The court notes that the words "Oden" and "Choctaw" appear nowhere in the plaintiffs' ar-

gument on this issue. *See* Pl. Br. at 27–35.

### 3. Diversity

 Finally, the court must consider the only argument that the plaintiffs have advanced that is clearly before the court. *See* Section II, *supra.* As discussed above, NFMA Regulations provide that diversity must be considered throughout the planning process, that inventories must include data necessary to evaluate diversity, and that diversity must be considered for each planning alternative. 36 C.F.R. § 219.26. In particular, "[r]eductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives." 36 C.F.R. § 219.27(g). Management prescriptions, such as even-aged timber cutting, where appropriate and practical, must "preserve and enhance" the diversity of plants and animals. *Id.*

The Choctaw EA and EA Supplement both consider diversity and conclude that diversity will be enhanced by the selected timber option. Diversity is separately addressed for each alternative in the EA. *See* EA, Environmental Consequences at unnumbered pages 19–24, Cumulative Effects Analysis at unnumbered pages 25–26. In particular, for the alternative contemplating even-aged management, the EA concludes that diversity, on balance, will increase because certain animal species will benefit from the timber clearing, *e.g.*, white-tailed deer, harvest mice, wild turkey, and bobwhite quail. EA at unnumbered page 20. The diversity of plants will increase as well because "new regeneration areas will result in more sunlight reaching the Forest floor and thus increase herbaceous vegetation." *Id.* On a more technical note, plaintiffs assert that the Forest Service considers only "beta diversity" (diversity between the stands), and not "alpha diversity" (diversity within the stand). Pl. Br. at 37. This assertion is incorrect, for the agency discusses both alpha and beta diversity in the EA Supplement. Choctaw EA Supplement at unnumbered page 8. The court notes with concern, however, that diversity was not mentioned specifical-

ly in the Choctaw Decision Notice, or the NFMA Findings of the EA Supplement, as a basis for choosing the even-aged alternative. But in light of the substantial consideration diversity received in the EA and EA Supplement, the court does not regard this oversight as fatal to the Choctaw decision.

### VI.

Ultimately, plaintiffs in this action want the court to substitute its discretion for that of the Forest Service in order to halt even-aged management techniques in the Ouachita. To do so, however, would be improper, for the agency's decisions satisfy the arbitrary and capricious standard of review. Plaintiffs' motion for an injunction will therefore be denied.