**Joseph M. GLISSON, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE,
et al., Defendants.**

**Civ. No. 92–4205.**

United States District Court,
S.D. Illinois.

Oct. 23, 1992.

Joseph Glisson, pro se.

William E. Coonan, Asst. U.S. Atty., Fairview Heights, Ill., Leslie M. Auriemmo, U.S. Dept. of Agriculture, Office of the General Counsel, Milwaukee, Wis., Randy

Patchett obo Dale Brent, Winters, Brewster, Murphy, Crosby & Patchett, Marion, Ill., for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Senior District Judge:

Before the Court is the plaintiff's Motion for Preliminary Injunction (Document No. 5). The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (1988).

## I. BACKGROUND

The plaintiff filed this lawsuit to halt two timber sales in the Shawnee National Forest. During a hearing on the plaintiff's request for a temporary restraining order, the Forest Service informed the Court that one of the projects, known as Opportunity Area 6, was already under administrative stay. The Court, therefore, has considered the plaintiff's request for a preliminary injunction only with respect to the other project, known as the Whoopie Cat Hardwood Sale.

The Whoopie Cat project has been in the planning stages for more than four years. The Forest Service initially planned to clearcut the hardwoods in the sale area and issued a decision notice to that effect on February 24, 1988. In response to public outcry, however, the Forest Service withdrew the decision notice and sought public comment on its alternative plan to cut the Whoopie Cat hardwoods through the group selection and individual tree selection harvest methods.

In compliance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1988), the Forest Service prepared an environmental assessment of the revised timber sale proposal. Based upon the results of the environmental assessment, the Forest Service issued a Decision Notice and Finding of No Significant Impact on August 7, 1990. The Forest Service argues that the plaintiff did not personally appeal this decision and, therefore, is not entitled to bring this lawsuit because he did not exhaust his administrative remedies. However, the plaintiff argues that he was involved in an appeal filed by the Regional Association of Concerned Environmentalists, of which he is a founding member.

The Forest Service opened bids for the Whoopie Cat project in September 1990, and defendant Dale Brent was identified as the high bidder. The timber sale contract was not immediately awarded. The precise reason for the delay is unclear. However, the record indicates that during this time period, the Forest Service was in the process of amending its 1986 Shawnee Forest Plan, as required under a 1988 settlement agreement.[1] Under the amendment, the Forest Service proposed a major change in its harvesting techniques, moving away from the 1986 plan's emphasis on clearcut and group selection methods and adopting a method described as "gap-phase dynamics."[2]

The Forest Service began the formal process of amending the plan by issuing a notice of intent on June 30, 1989. A proposed Amended Plan and Draft Supplemental Environmental Impact Statement were issued for public review on May 17, 1991. The final decision to amend the plan was documented in a Record of Decision and Final Supplemental Environmental Impact Statement issued on March 23, 1992. On May 14, 1992, the decision was withdrawn and reissued, with a new decision date, to reflect a minor change in the amended plan's guidelines for the Indiana and gray bats.

While the draft amended plan was pending, the state's congressional delegation, led by Rep. Glenn Poshard, asked the Forest Service to modify the terms of timber

---

1. The settlement agreement resulted from several appeals filed against the Forest Service's decision to adopt the 1986 Forest Plan. In an attempt to informally resolve those appeals, the Forest Service agreed to study and evaluate an amendment to the 1986 plan. This agreement was memorialized in a written agreement signed on August 15, 1988.

2. "Gap-phase dynamics" is intended to simulate the process of natural mortality and the resulting gaps and regeneration within hardwood forests. Under this method of harvestation, trees are cut individually or in small groups no larger than .6 acre in size. Harvestation through group selection allowed for timber cuts of up to two acres in size.

sales that were already under contract so that these sales would utilize the "gap-phase dynamics" method preferred in the Amended Forest Plan. When the Forest Service refused, Congress passed an amendment to the 1992 Appropriations Act that provided as follows:

> The Forest Service shall work with the purchasers of sales already under contract on the Shawnee National Forest to achieve mutually acceptable modifications to said contracts so that the harvest of timber under such contracts may occur consistent with the expected management prescriptions and/or practices envisioned in the Draft Amendment to the Forest Plan for the Shawnee National Forest issued in 1991.
>
> To the greatest extent possible, and pending final approval of the Draft Amendment to the Shawnee National Forest Plan, none of the funds available in this Act shall be used for preparation of timber sales using clearcutting or other forms of even aged management in hardwood stands in the Shawnee National Forest, Illinois.

Department of the Interior and Related Agencies Appropriations Act, Pub.L. No. 102–154, 105 Stat. 990, 1019 (1991).

As a result of this congressional directive, the Forest Service modified the terms of the Whoopie Cat timber sales contract, reducing the size of the timber cuts from a maximum of two acres in size to a maximum of .6 acre as provided in the proposed amended forest plan. The Forest Service then awarded the sale to Dale Brent Logging on May 5, 1992, but did not supplement its environmental assessment or issue a new decision notice regarding the changes that were made to the sale.

Brent began cutting the Whoopie Cat timber in mid-September 1992 at the rate of about 100 trees per day. The plaintiff filed this lawsuit against the Forest Service on September 24, 1992. The suit originally was based only upon the planned sale in Opportunity Area 6, but the plaintiff subsequently amended his complaint on October 6, 1992, to include the Whoopie Cat timber sale. The plaintiff filed a motion for a temporary restraining order on October 13, 1992, and the matter was set for hearing on October 16, 1992.

During that proceeding, the Court scheduled a hearing the following week on the plaintiff's request for a preliminary injunction. Because of the expedited hearing on the injunction and because defendant Brent stated that he would not log during the weekend, the Court denied the temporary restraining order. Following the hearing on the request for a preliminary injunction on October 21, 1992, the Court took the matter under advisement.

## II. ANALYSIS

A preliminary injunction is extraordinary relief and will be granted only if the plaintiff can show: (1) a probability of success on the merits; (2) the existence of irreparable harm; (3) the absence of an adequate remedy at law; (4) that the threat of harm to the plaintiff outweighs the harm that would result to the opposing party should the order be issued; and (5) that the public interest will not be disserved by granting the relief. *Regional Association of Concerned Environmentalists v. United States Dep't of Agric.*, 765 F.Supp. 502, 505 (S.D.Ill.1990).

Although the Court heard considerable evidence regarding the balance of harms in this case, the Court's analysis of the legal issues involved shows that the plaintiff has no likelihood of success on the merits. The Court, therefore, must deny the request for a preliminary injunction.

The plaintiff contends that the Forest Service violated the law by proceeding with a revised Whoopie Cat sale without issuing a new decision notice or preparing a supplement to the environmental assessment for the project. Thus, he argues that the public was not notified of the revised sale or given any opportunity to appeal the Forest Service's decision. The Forest Service, however, argues that the public had a full opportunity to comment on the Whoopie Cat sale when the decision notice was issued in August 1990. The agency contends that no further notice was required when it revised the sale to provide for

timber cuts of no greater than .6 acre, as opposed to the two-acre cuts that were originally envisioned.

Upon first impression, the Court can easily see how the plaintiff might perceive that he was "sandbagged" when the Forest Service revised the sale without publishing any public notice or otherwise allowing for public comment or appeal of the changes. The plaintiff has an appeal pending with respect to the Amended Forest Plan and had asked the Forest Service to stay "all forest fragmenting activities (i.e., logging, road building, etc.) until such time as this appeal is resolved." The stay was denied under 36 C.F.R. § 217.10(c) because it did not identify specific projects or activities that would create imminent harm to the plaintiff.[3] However, the Forest Service stated that in implementing the amended plan, it would give notice of its project and activity decisions as required by 36 C.F.R. § 217.5(b). The agency further stated that "[y]ou may wish to appeal decisions on specific projects or activities while we are reviewing your appeal of the Amended Forest Plan." The plaintiff contends that the Forest Service has reneged on this agreement by going forward with the revised Whoopie Cat sale without giving notice.

Although the Court is sympathetic to the plaintiff's concerns, the Court concludes that under the existing regulations, the Forest Service was not legally required to provide further notice of this particular timber sale. As the Forest Service points out, the August 1990 decision to cut timber in the Whoopie Cat area was made in full compliance with the existing forest plan and with NEPA's requirements that the agency consider the environmental effects of the project. Based upon an environmental assessment, the Forest Service determined that the timber harvest, which was based upon the group selection method,

would have no significant impact on the environment. At that point, therefore, the Forest Service could have entered into a valid contract allowing timber cuts of up to two acres in size at Whoopie Cat.

The agency did not immediately award the contract, however. Instead, the Forest Service revised the sale to provide for timber cuts of .6 acre or smaller, as envisioned in the draft amended forest plan, before awarding the contract to Dale Brent Logging in May 1992. It is important to note that this revision was not required by the proposed amended forest plan. To the contrary, the amended plan was not finally adopted until May 1992. Moreover, the plan was not effective until 30 days after a new notice of availability was published in the Federal Register.

The Forest Service states that its modification of the project was done in compliance with 1992 Appropriation Act's requirement that the Forest Service

work with the purchasers of sales already under contract on the Shawnee National Forest to achieve mutually acceptable modifications to said contracts so that the harvest of timber under such contracts may occur consistent with the expected management prescriptions and/or practices envisioned in the Draft Amendment to the Forest Plan for the Shawnee National Forest issued in 1991.

Based upon the plain language of this paragraph, the directive was inapplicable to the Whoopie Cat project. Although the Forest Service had issued its decision to cut the timber at Whoopie Cat and had opened bids for the project, the sale was not yet under contract. The Court finds, however, that implicit in the 1992 Appropriations Act is a congressional intent to have the Forest Service bring all pending timber sales into compliance with the new harvestation tech-

**3.** This decision is amply supported by the regulations. Section 217.10(b) provides that "[r]equests to stay the approval of land and resource management plans prepared pursuant to 36 C.F.R. part 219 shall not be granted. However, requests to stay implementation of a project or activity included in such a plan will be considered as provided for in paragraph (c)." Paragraph (c) allows the Forest Service to stay par-

ticular projects or activities that would be implemented before an appeal could be decided on the amended plan. However, to properly request a stay of implementation, the applicant must provide written justification for the stay, including, *inter alia,* a description of specific projects or activities to be stopped and the specific adverse effects of the project upon the applicant.

niques proposed in the draft amended forest plan.

Moreover, Congress effectively forced the Forest Service to revise all other pending timber sales in accordance with the proposed plan by prohibiting the expenditure of 1992 funds "for preparation of timber sales using clearcutting or other forms of even aged management in hardwood stands in the Shawnee National Forest, Illinois." The Forest Service, therefore, was acting in accordance with this congressional directive when it remarked the Whoopie Cat sale.

The Forest Service regulations in existence at the time of this revision did not require the agency to issue a new decision notice and, therefore, the plaintiff was not entitled to any further appeal. The regulations generally provide that "[o]nly decisions documented in a Decision Memo, Decision Notice, or a Record of Decision are subject to appeal under this part." 36 C.F.R. § 217.3(a)(1). The regulations expressly provide for appeals of all projects and activities for which decision documents are prepared, such as timber sales and road construction. *Id.* § 217.3(b)(3). However, the regulations also provide for certain decisions which are not subject to appeal. *Id.* § 217.4(a). More specifically, the regulations state:

> In addition to decisions excluded from appeal by paragraph (a) of this section, the Forest Service shall dismiss any notice of appeal on subsequent implementing actions that result from the initial decision subject to review under this part as defined at § 217.3(b)(3). For example, an initial decision to offer a timber sale is appealable under this part; subsequent decisions to advertise or award that sale are not appealable under this part. A subsequent implementing decision that is documented in a new decision document would be subject to appeal under this part.

*Id.* § 217.4(b).

Therein lies the Court's dilemma. Although the sale would be subject to notice and appeal if a new decision document was issued, there is nothing in the Forest Service regulations that provides any guidance as to when a new decision document must be issued. The Court notes that the Forest Service has subsequently adopted certain provisions in the Forest Service Handbook to address this situation.[4] However, at the time that the agency modified the project and awarded the contract, no such regulations or handbook provisions were available to guide the agency when modifying a project that had already been duly approved.

The Court notes that the Council on Environmental Quality (CEQ) regulations implementing NEPA are similarly unhelpful. The regulations require supplementation of an environmental impact statement (EIS) if the agency (1) makes substantial changes in the proposed action that are relevant to environmental concerns; or (2) there are significant new circumstances or information relevant to environmental concerns

---

**4.** The Forest Service's Environmental Policy and Procedures Handbook, effective September 21, 1992, provides that

> If new information or changed circumstances relating to the environmental impacts of a proposed action come to the attention of the responsible official after a decision has been made and prior to completion of the approved program or project, the responsible official must review the information carefully to determine its importance.
>
> .    .    .    .    .
>
> If the responsible official determines that a correction, supplement, or revision to an environmental document is necessary, follow the relevant direction in section 18.2–4.

Forest Service Handbook 1909.15, 10 § 18.1 (1992). Where a project decision was based upon an environmental assessment, as opposed to an environmental impact statement, section 18.4 provides that

> Revise an EA if the interdisciplinary review of new information or changed circumstances indicates that changes in the EA are needed to address environmental concerns that have a bearing on the action or its impacts.
>
> Upon completion of the revised EA, prepare a new finding of no significant impact (FONSI) which addresses the effects of the action. Reconsider the original decision; and, based upon the EA and FONSI, issue a new decision notice or document that the original decision is to remain in effect and unchanged....
>
> If, based on the revised EA, the proposed action may have a significant effect, issue a notice of intent to prepare an EIS. Follow the instructions in chapter 20.

*Id.* § 18.4.

and bearing on the proposed action or its impacts. 40 C.F.R. 1502.9(c)(1) (1991). However, the regulations make no reference whatsoever to the issue of supplementing environmental assessments.

The Court notes that the Forest Service apparently did consider whether it was necessary to supplement the environmental assessment and issue a new decision document. However, the agency ultimately decided that this action was unnecessary because the terms of the revised sale fell within the parameters of the project as originally authorized. More specifically, the 1990 decision notice and environmental assessment were based upon the harvest of 265 acres of timber through the group selection method. The revised sale provided for the same acreage, but merely changed the size of the timber cuts, allowing cuts of up to only .6 acre in size, as compared with the original two-acre cuts.[5] Because the revised project fell within the parameters of the original project, the Forest Service decided that the original environmental assessment adequately addressed the environmental impacts of the project and no supplementation or further decision document was necessary.

Under the facts and circumstances described above, the Court agrees that the Forest Service did not violate the law by proceeding with the revised timber sale without giving additional public notice. The Court shares the plaintiff's concern about the environmental effects of logging in the Shawnee National Forest. However, the facts show that the Forest Service sufficiently considered these effects when it issued its decision to proceed with the timber sale in 1990.

Although the Forest Service subsequently revised the plan, the record indicates that the changes were intended to have beneficial, rather than adverse, environmental consequences. In a letter that was read into the Congressional Record, Congressman Glenn Poshard described the new "gap-phase dynamics" harvesting techniques as a "more advanced and ecologically sensitive" method of harvestation. 137 Cong.Rec. S13260, S13274 (1991). Therefore, when the Forest Service remarked the Whoopie Cat timber sale to allow for timber cuts of .6 acre or smaller, the project would have less of an environmental impact than originally envisioned. *Cf. Cronin v. United States Dep't of Agric.,* 919 F.2d 439, 448 (7th Cir.1990) (agency's decision to implement group selection techniques would have less environmental impact than original plan providing for clearcutting). Accordingly, the Forest Service was not required to supplement the environmental assessment or issue a new decision notice before proceeding with the sale.

The Court's discussion of these legal issues shows that the plaintiff would not prevail on the merits of his lawsuit and, therefore, the request for a preliminary injunction must be denied. Based upon the analysis above, the Court further finds it appropriate to consolidate the hearing on the motion for preliminary injunction with the trial on the merits, as provided in Rule 65(a)(2) of the Federal Rules of Civil Procedure. As a result, the Court orders this case dismissed with respect to the plaintiff's request for a permanent injunction against the Whoopie Cat Hardwood Sale.

## III. CONCLUSION

For the foregoing reasons, the Court hereby DENIES the plaintiff's Motion for

---

**5.** The plaintiff contends that the Forest Service's revision ended up increasing the amount of timber to be harvested in Whoopie Cat. In support of this argument, the plaintiff notes that the 1990 environmental assessment estimated that the sale would produce 416 mbf of hardwood, but the timber sale contract awarded to Dale Brent Logging provided for 604 mbf of hardwood.

The Court finds that the Forest Service has sufficiently explained this discrepancy. As the agency points out, the volume of timber listed in the environmental assessment was based purely upon an estimate. The agency did not base its environmental assessment or its decision notice on the estimated volume, but rather upon the total number of acres to be logged. The record shows that the total number of acres to be cut is unchanged from the environmental assessment to the final award. The only difference is that the Forest Service, after actually marking the trees within the sale area, was better able to quantify the volume of timber that could be produced from that acreage.

Preliminary Injunction (Document No. 5). In addition, the Court CONSOLIDATES the hearing on the motion for preliminary injunction with the trial on the merits, as provided in Rule 65(a)(2) of the Federal Rules of Civil Procedure, and ORDERS the plaintiff's claim DISMISSED with respect to the Whoopie Cat Hardwood Sale. Further proceedings will be scheduled in due course with respect to the plaintiff's remaining claim involving Opportunity Area 6.

IT IS SO ORDERED.