William CRONIN, et al.,
Plaintiffs–Appellants,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,
Defendants–Appellees.

No. 90–2744.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1990.

Decided Nov. 28, 1990.

Barry Levenstam, Thomas C. Buchele, Chicago, Ill., Joseph Glisson, Pomona, Ill., for plaintiffs-appellants.

Stephen B. Clark, Asst. U.S. Atty., Office of the U.S. Atty., East St. Louis, Ill., Leslie Auriemmo, Dept. of Agriculture, Milwaukee, Wis., Thomas F. Crosby, Winters, Brewster, Murphy, Crosby & Patchett, Marion, Ill., for defendants-appellees.

Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Recreational frequenters of the Shawnee National Forest in southern Illinois have appealed from the denial of their request for a preliminary injunction. The Forest Service authorized a sale of timber, to be harvested by the method of logging known as "group selection," from a 661-acre tract, called "Fairview," of the 260,000-acre national forest. The suit charges that the sale violates federal law, in particular the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.* The former statute requires a federal agency to prepare an environmental impact statement before the agency undertakes a "major" action having a "significant" impact on the environment, 42 U.S.C. § 4332(2)(c), while the latter requires contracts for the exploitation of the national forests' timber resources to conform to the Forest Service's land management plans. 16 U.S.C. § 1604(i).

The Service had issued such a plan for the Shawnee National Forest in 1986, and with it a statement of the plan's environmental impact that the plaintiffs acknowledge complied with the National Environmental Policy Act. The plan divided the forest into areas called "Management Prescriptions." Fairview is in Management Prescription 3.2, and the plan authorizes logging there by the method known as "even-aged management," and specifically by clear-cutting. (If all the trees in a tract are cut down at once, the new trees that grow in their place will be of roughly the same age.) But the plan also authorizes

"uneven-aged management" in Management Prescription 3.2 where necessary to achieve certain specified objectives, including "visual quality objectives," a euphemism for not too unsightly. Uneven-aged management can take the form of either cutting down individual trees or clearing small patches. The latter method is called "group selection"—a more informative name would be "clear-cutting at retail"—and has not been used before in the Shawnee National Forest. Either method results in an area in which the trees are of uneven age, since if one tree or a small swatch of trees is cut down the tree or trees that grow up in its (their) place will be younger than the surrounding trees, which had been spared.

Concerned by the amount of clear-cutting authorized by the 1986 plan, conservation-minded users of Fairview sought review of the plan in accordance with procedures that the Forest Service has established. The administrative proceeding was dropped when the Service agreed to amend the plan to limit the amount of clear-cutting allowed. But the settlement agreement (which, incidentally, the plaintiffs in this case refused to sign) disclaims any purpose of preventing the plan from becoming final and effective, as it has since become. The amended plan envisaged by the settlement, along with a statement of the environmental impact of the amendments, is in the works but has not yet been completed; nevertheless the Forest Service has suspended clear-cutting in Management Prescription 3.2 indefinitely.

■ Earlier this year the Forest Service revived a previous plan for logging in Fairview. A private logger would be permitted to conduct group selection by clearing the trees on patches ranging from one-quarter acre to two acres in size scattered throughout the Fairview area; added together the patches would come to 26 acres. After receiving written comments from the later-to-be plaintiffs in this case and others, the supervisor of the Shawnee National Forest issued a written decision authorizing the project to go forward. The decision indicates that the forest supervisor believes the project to be consistent with Management Prescription 3.2, and hence not to violate the National Forest Management Act, because group selection is necessary to achieve the management plan's visual quality objectives. The decision does not say this in so many words, but the implication is unmistakable. Group selection is said to have been chosen because it "responds to public concerns about the effects of clearcutting on ... forest services," and clear-cutting rejected because it "would not meet the established visual quality objectives of partial retention." Management Prescription 3.2 allows group selection in lieu of clear-cutting when it is necessary to meet visual quality objectives, and evidently the forest supervisor thought it was. He could have said this more clearly, but a reviewing court may—without violating the rule of *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), against the court's supplying a rationale for the agency's decision—"uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation Co., Inc. v. Arkansas–Best Freight Co., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); see also *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945); *Consolidated Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1550 n. 18 (D.C.Cir.1985); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137 (Fed.Cir.1987) (per curiam). That undemanding standard is satisfied here—especially when allowance is made for the fact that the decision is that of a local forest supervisor rather than of the members of a sophisticated agency in Washington. It was in a case involving such an agency, the Federal Power Commission, that the Supreme Court declined to remand for further findings because even though the Commission's findings "leave much to be desired," *Colorado Interstate Gas Co. v. FPC, supra*, 324 U.S. at 595, 65 S.Ct. at 836, "the path which it followed can be discerned." *Id.* It can be discerned here. A remand for better findings would serve the plaintiffs' interest in delaying the timber sale, but no other inter-

est, for it is plain what those findings must be. *Chenery* does not require futile remands. *Illinois v. ICC*, 722 F.2d 1341, 1348–49 (7th Cir.1983); *Erie–Lackwanna R.R. v. United States*, 279 F.Supp. 316, 354–55 (S.D.N.Y.1967) (three-judge court) (Friendly, J.), aff'd with modifications, and remanded, under the name *Penn–Central and N & W Inclusion Cases*, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968).

The forest supervisor suggested another reason for authorizing group selection in Fairview. It would be a boon to "shade intolerant" trees (trees that need more sun than they can get in a dense forest—the Forest Service's proclivity to employ a wooden vocabulary is an unintentional irony in this case) because it would create open areas through which the sun, when it is not directly overhead, would stream into the surrounding woods. It is these very trees—the oaks and hickories—that the logger is after. The patches that he will be clearing if we let him are the ones in which those trees are concentrated; apparently, group selection, which is more costly than clear-cutting, pays only when the groups selected include the commercially more valuable trees.

■ After stating that the project will enable the Forest Service's employees at Shawnee National Forest to gain experience with group selection, the forest supervisor's decision concludes with a "finding of no significant [environmental] impact." The basis for this finding is an "environmental assessment" that the forest supervisor had prepared shortly before. An environmental assessment is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary. *River Road Alliance, Inc. v. Corps of Engineers*, 764 F.2d 445, 449 (7th Cir.1985). ("Rough-cut" and "low budget" are relative terms: the environmental assessment in this case is 112 pages long—4.3 pages per acre.) Since the forest supervisor did not believe that the logging contract would

have a significant environmental impact, he did not think an environmental impact statement required. Incidentally, the environmental assessment also notes that one of the major concerns with clear-cutting is its effect on visual quality and that uneven-aged management helps "maintain aesthetic values." This is further evidence that the forest supervisor's decision was indeed based, in part anyway, on a belief that the substitution of group selection for clear-cutting in Fairview was necessitated by concern about visual quality.

After exhausting their administrative remedies by appealing the forest supervisor's decision to the regional forester, 36 C.F.R. § 217.7(b)(1), the plaintiffs brought this suit, which the district judge referred to a magistrate for a brief evidentiary hearing after which the judge denied the plaintiffs' request for a preliminary injunction. And this is the first puzzle about the case: why the district judge thought it proper to order an evidentiary hearing.

■ When persons harmed by administrative action bring a suit for injunction in a federal district court, it is not because they want, or are entitled to, a trial. It is because when Congress has not prescribed the mode of judicial review of a particular type of administrative decision, here a decision by the Forest Service, the presumption is not that judicial review is unavailable but that it is available by proceeding in federal district court under 28 U.S.C. § 1331, which gives those courts power to entertain suits arising under federal laws. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 142–43, 87 S.Ct. 1507, 1512, 18 L.Ed.2d 681 (1967); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Rockford League of Women Voters v. Nuclear Regulatory Comm'n*, 679 F.2d 1218, 1220 (7th Cir. 1982). In such a suit the district court is a reviewing court, like this court; it does not take evidence. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963); *St. James Hospital v. Heckler*,

579 F.Supp. 757, 762 (N.D.Ill.1984), aff'd, 760 F.2d 1460 (7th Cir.1985). Not often, anyway. An evidentiary hearing in district court may be necessary to reconstruct the agency's action or the grounds thereof, if the action and its grounds were not set forth in a written decision, *Edgewater Nursing Center, Inc. v. Miller*, 678 F.2d 716, 718 (7th Cir.1982), though an even better response might be to stay the judicial review proceeding until the agency completed the record. *United States v. Carlo Bianchi & Co., supra*, 373 U.S. at 717–18, 83 S.Ct. at 1414–15. But here the agency embodied its decision and reasons in a substantial document. An evidentiary hearing in the district court might appear necessary if the agency had refused to allow the introduction of probative evidence. But the appearance is misleading. The proper judicial remedy in such a case is to order the agency to hold a proper hearing—not for the court to conduct the hearing itself. *Florida Power & Light Co. v. Lorion, supra*, 470 U.S. at 744, 105 S.Ct. at 1607. In short, only in an emergency should a reviewing court, whether a district court or any other federal court, conduct its own evidentiary hearing.

Confining the district court to the record compiled by the administrative agency rests on practical considerations that deserve respect. Administrative agencies deal with technical questions, and it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency. Trees may seem far removed from the arcana of administrative determination, but one has only to glance at the documents submitted in this case to realize that "silviculture" is in fact a technical field, and not just one with a dry and forbidding vocabulary.

Therefore only if there is no record and no feasible method of requiring the agency to compile one in time to protect the objector's rights—in short, only (to repeat) if there is an emergency—should an objector be allowed to present evidence in court showing why the agency acted unlawfully.

And this was not such a case. The forest supervisor made a variety of interpretive and factual determinations in a substantial written opinion and even lengthier environmental assessment, and he did so *after* the plaintiffs had submitted their own voluminous evidentiary materials to him. It is unclear whether the supervisor would have granted the objectors an oral hearing if they had requested one, or even whether they did request one, but these questions are immaterial. The plaintiffs are unable to show that the paper hearing that the supervisor did conduct was inadequate to develop the facts necessary to a sound decision.

▮ The Forest Service did not object to the evidentiary hearing before the magistrate, or otherwise invoke the principle that limits the reviewing court, even when it is a district court, to the administrative record save in exceptional circumstances not present here. And by not objecting it waived its right to object on this appeal to that hearing. But the waiver of a right to object to an evidentiary hearing on a motion for preliminary injunction does not carry over to the subsequent proceeding for deciding whether to enter a permanent injunction. Should there be such a proceeding in this case, therefore, it would be open to the Forest Service to argue that the district judge must base his decision whether or not to enter a permanent injunction on the administrative record, or at least must not permit the introduction of any additional evidence besides what was before the magistrate. And for reasons stated earlier, the judge would have to accept the argument.

▮ To understand fully why we have limited the scope of the Forest Service's waiver of objection to evidentiary proceedings in the district court in this way, one first must understand that the ultimate question to be decided when a plaintiff moves for a preliminary injunction is whether granting, or denying, the motion is the decision that will minimize the costs of error arising from the fact that the motion must be decided without a full hearing on

the merits of the plaintiff's claim. If the irreparable harm to the plaintiff from denial of the injunction greatly exceeds the irreparable harm to the defendant from granting it, the injunction should be granted, provided only that the plaintiff has some—it need not be a great—chance of winning when the full hearing is held. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387–88 (7th Cir.1984); *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593–94 (7th Cir.1986); *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433–34 (7th Cir.1986); *Ping v. National Education Ass'n*, 870 F.2d 1369, 1371–72 (7th Cir. 1989); *Thornton v. Barnes*, 890 F.2d 1380, 1384–85 (7th Cir.1989). For when the likelihood that the plaintiff's claim is just is weighted by the (great) harm that he will incur if the preliminary injunction is denied, that denial may be a great injustice to the plaintiff, while when the likelihood that the plaintiff's claim is unjust is weighted by the (slight) harm to the defendant if the injunction is granted, granting the injunction may be only a slight injustice to the defendant even if the defendant has a somewhat stronger case. But all this assumes that the decision whether to grant or deny the preliminary injunction is preliminary to a full hearing on the plaintiff's claim. If it is not—if the two stages are collapsed into one because there will never be a fuller hearing—then considerations of irreparable harm are out the window and the only question is whether the plaintiff is entitled to an injunction, period. We are then in the domain of Rule 65(a)(2) of the Federal Rules of Civil Procedure, which authorizes consolidation of the hearing on the motion for a preliminary injunction with the trial on the merits. *Drummond v. Fulton County Dept. of Family & Children's Services*, 563 F.2d 1200, 1204 (5th Cir.1977) (en banc).

This is such a case. Because the plaintiffs are not entitled to present evidence in court to challenge the forest supervisor's decision (and for the reasons discussed earlier, this point has not been waived so far as further proceedings in the district court are concerned), there will never be an evidentiary hearing in court. All that the plaintiffs are entitled to do in the courts is to try to persuade the district judge and then us, on the basis of the evidence that was before the forest supervisor when he made his decision, that the decision is unlawful. The record is complete; there is no point in any further proceedings in the district court; we may therefore consider the case as if the district judge had entered judgment for the Forest Service at the end of the entire litigation.

The point is critical because the plaintiffs have the better of the argument on the issue of the respective irreparable harms to the parties if there is an interval between preliminary and final disposition. The plaintiffs are users of the Fairview area of the Shawnee National Forest; they like it in its present, natural state; and trees cut down this fall will not have grown back to their present height till most of the plaintiffs are dead. The quantification of such a harm is difficult but on the other side there is—nothing. The Forest Service's anticipated revenues from the logging are a few thousand dollars, and the irreparable harm from the delay of the project till a full hearing in the district court would be at most the time value of the profit component of that revenue, a value which no one has bothered to quantify and which probably is trivial. A harm so purely pecuniary—so readily quantifiable—from the grant of a preliminary injunction could in any event be prevented by requiring the plaintiff to post an injunction bond or equivalent security in accordance with Rule 65(c) of the Federal Rules of Civil Procedure, which makes such security mandatory, although a number of environmental decisions, illustrated by *People of California ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325–26, amended on other grounds, 775 F.2d 998 (9th Cir.1985) (per curiam), and *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322 (9th Cir.1975) (per curiam), and our own *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir.1972), waive the requirement or allow the posting of a nominal bond.

The Forest Service argues that its reputation as a manager of our national forests will be irreparably harmed by even a few months' delay in resolving this suit in its favor, but that is absurd. This is not to say that only pecuniary harms can justify the denial of a preliminary injunction. On the contrary, pecuniary harm to a defendant against whom such an injunction is issued can usually be averted by requiring the plaintiff to post an injunction bond. The government has an interest in carrying out its programs that is not always quantifiable, or fully protectable by an injunction bond, and such an interest can justify the denial of a preliminary injunction or the dissolution of a stay. *Coleman v. PACCAR Inc.*, 424 U.S. 1301, 1307, 96 S.Ct. 845, 848, 47 L.Ed.2d 67 (1976) (Rehnquist, J., in chambers). But the only such interest argued here is the Forest Service's interest in its reputation as an effective manager of the national forests, and we are not able to see how that interest is engaged. It is true that the sum of many small numbers can be a large number. This timber sale is trivial but the aggregation of all timber sales from the national forests is not. The Forest Service, however, has not placed before the district court or us any evidence of the aggregate impact of suits such as the present one on its program of exploiting the forests' timber resources.

The opinion of Justice (now Chief Justice) Rehnquist in *PACCAR* contains language that could be thought to require that in cases in which a preliminary injunction is sought against a government agency, the sliding-scale approach that this and other courts use in deciding on the propriety of granting such an injunction is improper, at least to the extent that it will in some cases authorize the granting of the injunction even if the plaintiff is unable to show that he probably will win the trial on the merits. 424 U.S. at 1307, 96 S.Ct. at 848. It is unclear that this implication was intended; in any event this circuit's position is that the sliding-scale cases (*Roland, American Hospital Supply, Lawson,* and the rest) are applicable even when the defendant is a government agency. *Busboom Grain Co. v. ICC*, 830 F.2d 74, 75 (7th Cir.1987).

Our discussion of the standard for preliminary injunctions may seem a bit to one side of this case, since the harms that will ensue while a case is awaiting the trial on the merits are irrelevant when there will never be a trial because the district court's function is merely to review the record compiled in an administrative proceeding. And since there is no interval between preliminary and final consideration in such a case, there is no reason to have a separate preliminary-injunction phase in it.

But that is in general, not in every case:

(1) If the administrative record is so vast or complicated that the district judge cannot analyze it and make his final decision in time to avert harm to the plaintiff due to delay, then the plaintiff can move for a preliminary injunction. That would be the kind of case in which a court of appeals might grant a stay of administrative action if that court was the first tier of judicial review of the agency's action, rather than the district court. 5 U.S.C. § 705; *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921 (D.C.Cir.1958); *Busboom Grain Co. v. ICC, supra,* 830 F.2d at 75. The standard is the same whether a preliminary injunction against agency action is being sought in the district court or a stay of that action is being sought in this court. *Id.*

(2) Likewise the plaintiff can seek a preliminary injunction against the execution of the administrative decision if the record is incomplete when suit is filed and if, as in (1), time is pressing. This may have been the reason for the hearing before the magistrate in this case. Apparently, certain key documents that were part of the record of the administrative action, such as the environmental impact statement for the 1986 management plan, were not submitted to the court until that hearing. The record is now complete, however.

(3) Or, what is closely related, a preliminary injunction may be proper if the case is one of the unusual administrative review cases in which an evidentiary hearing is necessary in order to reconstruct the ground or contents of the agency's decision

and the alternative of staying the review proceeding for further administrative action is infeasible—presumably because, once again, of time.

It is no accident that these reasons why a court reviewing an administrative decision might grant a preliminary injunction in the exceptional case are the same reasons why a reviewing court might hold an evidentiary hearing in the exceptional case; the underlying criterion is the same in both cases—an emergency that prevents leisurely consideration by the reviewing court of an adequate administrative record. But they are not reasons for a further evidentiary hearing in the district court after the administrative record is complete and both the district court and this court have had time to study it. Should we be wrong, however, it would make no difference in this case. The plaintiffs are unable to indicate to us what further evidence they might introduce in the district court that would strengthen their legal claims, which we find very weak although we share the plaintiffs' desire to preserve some forest covering in this almost bald state.

 As a general rule (we shall take up the exceptions shortly), once an environmental impact statement has been issued for a project, the project can be carried out without the agency's having to issue a new statement for every stage of the project. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 1858–59, 1864, 104 L.Ed.2d 377 (1989); *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1178 (9th Cir. 1990). Otherwise the project could never be completed. It would be the application to law of Zeno's Paradox (how can one cross even a finite interval in a finite amount of time, when any interval can be divided into an infinite number of segments each of which must be crossed in turn in order to traverse the entire interval?). So if group selection in Fairview is authorized by the Shawnee National Forest plan for the area called Management Prescription 3.2, then, at least as a first approximation, the Forest Service was not required to prepare such a statement and the National Environmental Policy Act, the source of such requirements, was not violated. Nor the National Forest Management Act, which merely required that the logging contract comply with the management plan. The plaintiffs read the plan to say that if the Service does not want to use clear-cutting it must demonstrate that group selection will make the forest look better than individual-tree selection or no logging at all. This of course would be an impossible burden, because a forest does not look better with bald patches than without. We read the plan differently, as did the forest supervisor and also the magistrate and the district judge. We read it to say that clear-cutting is permissible throughout Management Prescription 3.2 (and therefore throughout Fairview) *unless* the results would be too unsightly (fail to achieve "visual quality objectives"), in which event the Service can authorize a less unsightly form of logging, such as group selection. The plan authorizes clear-cutting and the settlement left the plan intact until it is amended, which it has not been. If in this interim period the Forest Service decides to authorize a less unsightly form of logging than the clear-cutting that it is allowed to authorize, this does not violate the plan.

The plaintiffs' able counsel in this court (they had no counsel until the appeal) have mounted ingenious arguments aimed to show why clear-cutting might be better than group selection after all—such as that clear-cutting is done all at once, whereas group selection might entail numerous separate intrusions of loggers and their equipment into Fairview because the 26 acres authorized for group selection are in scattered, noncontiguous patches. The arguments are implausible coming from plaintiffs who until this lawsuit denounced clear-cutting as the worst method of logging from the standpoint of preserving forests in their natural state, which is the plaintiffs' goal. And if the frequency with which the loggers go on the land is the critical consideration, then not group selection but individual tree selection is the worst form of logging, although the plaintiffs like it the best. Anyway such argu-

ments fall short of demonstrating a violation of the plan, and hence a need for an environmental impact statement on the ground that the logging contract is a new action rather than just the carrying out of an action whose environment impact has already been assessed in an environmental impact statement.

As for the plaintiffs' argument that Management Prescription 3.2 did not contemplate *widespread* use of group selection and that 26 acres out of 661 is widespread, the second half of this argument is a good deal more persuasive than the first. Depending on the precise scatter of the patches throughout the Fairview area, they could well give it a scarred, ragged appearance that would justify calling the use of group selection "widespread" throughout the area. Since the patches are as small as a quarter of an acre, there could be dozens of them in what is after all little more than one square mile. But the management plan would have authorized the Forest Service to clear the whole area, and we find nothing in the plan to limit the amount of group selection that can be substituted for clear-cutting for the sake of visual quality, feebly as that quality may seem to be served by the substitution.

We said there were exceptions to the principle that a fresh environmental impact statement, with all the costs and delay entailed thereby, is unnecessary for a mere stage in a project for which such a statement had been prepared and found adequate under the National Environmental Policy Act. The Supreme Court held in *Marsh* that if because of changed circumstances or new information the old statement is not adequate to assess the environmental impact of the new project, there must be a new statement (109 S.Ct. at 1858–59; see also 40 C.F.R. § 1502.9(c)(1))—provided of course that the project meets the criteria for an environmental impact statement. This one does not, and we therefore need not decide whether, if it did, the standard of *Marsh* for when the agency must prepare a new statement would be satisfied.

 The environmental assessment that the forest supervisor prepared demonstrates, with adequate support in the record, that group selection in Fairview is not a *major* federal action likely to have a *significant* environmental impact. Only 26 acres of trees are at stake and the forest supervisor was explicit that the sale of these trees is not a precedent, an open sesame on future sales either from Fairview or from other parts of the Shawnee National Forest—a forest of ten thousand times 26 acres. The sale will have some impact because the clearing of the trees in swatches ("group selection") will make the Fairview area uglier than it is now, but less ugly than it would be if clear-cutting were employed, as the plan authorized. The *incremental* adverse environmental impact is negative.

Individual tree selection might seem best from an environmental standpoint, but this is irrelevant to the question whether group selection is more harmful to the environment than the clear-cutting that the plan, duly accompanied by a proper environmental impact statement, authorized. Yet it is at least interesting to note that the supervisor thought individual tree selection worse for the environment than group selection. He was concerned about the lack of sunlight for the oaks and hickories, a lack that individual tree selection would not correct. If this seems a hypocritical concern because the oaks and hickories are the very targets of the logging operations that he has authorized, still we cannot say that oaks and hickories in the woods adjacent to the cleared patches will not benefit from the additional sunlight. Moreover, "hypocritical" is too strong. The Forest Service is not forbidden to consider the benefits to loggers, and hence to the consumers of wood products, in deciding how to manage our national forests. The national forests, unlike the national parks, are not wholly dedicated to recreational and environmental values. And this means that it was not, as the plaintiffs argue, improper for the forest supervisor to consider the value to the Forest Service of experimenting with group selection in the Shawnee National Forest. In talking up the virtues of clear-

cutting over group selection, moreover, the plaintiffs are arguing opportunistically. They might come to regret as Pyrrhic a victory that encouraged the Forest Service to discard group selection in favor of clear-cutting. Undoubtedly the plaintiffs' real hope is that they can block both methods, but they are playing a risky game.

From the standpoint of the National Environmental Policy Act the essential point is that the sale will not create *new* environmental effects, effects not envisaged when the environmental impact statement was prepared in 1986. But the other points in the preceding paragraph are not irrelevant to this case. They show, contrary to another argument made by the plaintiffs, that the forest supervisor was not acting arbitrarily in authorizing this limited experiment with group selection; his decision is no more vulnerable on that ground than on the ground that it violates the National Environmental Policy Act or the National Forest Management Act.

 Other objections to the forest supervisor's decision are pressed but they have no possible merit and we mention one of them only because the plaintiffs emphasize it so. That is whether the decision gives adequate consideration to the impact of group selection on the possibility of creating a Forest Interior Management Unit in Fairview. This dreary bureauphorism denotes a habitat for neotropical birds, which is to say birds that winter in South America (warblers are an example). These birds require a large area of continuous tree cover, which group selection would ruin— though clear-cutting even more so. If the plan for the Shawnee National Forest is amended to prohibit clear-cutting, as the plaintiffs hope, then if group selection is also barred maybe a habitat for these migratory birds can be created in or rather including Fairview (Fairview itself is too small for such a habitat). And a regulation under the National Environmental Policy Act forbids an agency to take any action that would "limit the choice of reasonable alternatives" while a decision for which an environmental impact statement is required is under consideration. 40 C.F.R. § 1506(a)(2). The decision in question is the decision to adopt an amended management plan and, as we noted earlier, has not yet been made. The settlement agreement pursuant to which the plan is being amended designates twenty areas in the Shawnee National Forest as Forest Interior Management Units, and none of them includes any part of Fairview. This is some evidence that the inclusion of Fairview in such a unit would not be a "reasonable alternative." On the basis of this and other evidence the forest supervisor concluded that the regulation was inapplicable, and we cannot say that his decision was arbitrary or otherwise in error.

The judgment of the district court denying the plaintiffs' motion for a preliminary injunction is affirmed; further proceedings in the district court—if any—shall conform to the principles set forth in this opinion.

AFFIRMED.