Jon C. SHARPS, Plaintiff,

v.

**UNITED STATES FOREST SERVICE, United States Department of Agriculture; Robert G. Childress, District Ranger, Fall River District of the Nebraska National Forest; Butch Ellis, Acting Forest Supervisor, Nebraska National Forest; Gary E. Cargill, Regional Forester, Rocky Mountain Region; and F. Dale Robertson, Chief of the United States Forest Service, United States Department of Agriculture, Defendants.**

Civ. No. 91–5101.

United States District Court,
D. South Dakota, W.D.

March 26, 1993.

James F. Margadant, Sieler & Trimble, Rapid City, SD, for plaintiff.

Robert A. Mandel, U.S. Attys. Office, Rapid City, SD, for defendants.

## MEMORANDUM OPINION

BATTEY, District Judge.

## PROCEDURAL HISTORY

In August 1989, the Forest Supervisor for the Nebraska National Forest issued a decision notice which amended the forest plan for the Nebraska National Forest. Plaintiff Jon C. Sharps (Sharps) did not appeal this administrative decision.

In October 1990, a decision memo was published by the District Ranger for the Fall River Ranger District, a subdivision of the Nebraska National Grasslands. The October decision implemented the August decision previously issued by the Forest Supervisor.

In November 1990, Sharps filed with the Forest Supervisor for the Nebraska National Forest a first-level administrative appeal of the October decision memo. The Forest Supervisor upheld the District Ranger's October decision. Sharps then filed a second-level administrative appeal of the October decision memo with the Regional Forester for the Rocky Mountain Region. Again, the October decision was upheld. The decision of the Forest Service became final when the Chief of the Forest Service declined to exercise discretionary review of the Regional Forester's decision.

On September 13, 1991, Sharps filed a complaint with this Court seeking judicial review of the administrative appeals pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702. On April 24, 1992, the Court dismissed all claims of Sharps which were premised on the August decision. This dismissal was based on Sharps' complete failure to exhaust his administrative remedies as to the August decision. Because Sharps also stated claims based on the October decision, the Court allowed Sharps to file an amended complaint setting forth claims based only on the October decision. Sharps did so on May 15, 1992.

Presently pending is a motion by the United States Forest Service (Forest Service) to dismiss the claims asserted by Sharps in his amended complaint. The Forest Service argues that Sharps lacks standing to assert these claims and that Sharps has failed to state claims upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). *Amicus curiae* representing grazing permittees on the Nebraska National Grasslands have sought and been granted permission to file a brief in support of dismissal. Sharps has responded to both the *amicus curiae* brief and to the Forest Service brief. The motion is now before the Court for decision.

## FACTS

The Nebraska National Forest (NNF) is part of the national forest system and is composed of 1,059,444 acres located in northwest Nebraska and southwest South Dakota. A subdivision of the Nebraska National Forest is the Buffalo Gap National Grasslands, which is composed of 591,771 acres located in the South Dakota counties of Custer, Fall River, Jackson, and Pennington. The Fall River Ranger District makes up the west half of the Buffalo Gap National Grasslands.

In August 1989, a decision notice was issued by the Forest Supervisor for the NNF which changed the way that black-tailed prairie dogs were managed in the forest. Some of the changes that were brought about in the August 1989 decision notice were that: (1) Forest Service personnel in the NNF were authorized to use any pesticide approved by the Environmental Protection

Agency for use on prairie dogs, whereas before only the use of zinc phosphide was permitted in the NNF; (2) prairie dog colonies were to be consolidated to make management of the colonies more cost-efficient and to minimize migration of prairie dogs to private and Indian lands adjacent to the NNF; and (3) a one-mile buffer zone was to be attempted between prairie dog colonies on the NNF and private and Indian lands adjacent to the NNF.

Prior to the August 1989 decision becoming final, the Forest Supervisor had an Environmental Assessment (EA) prepared pursuant to the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2), to analyze the environmental effects that the proposed decision would have. The EA concluded with a finding of no significant impact (FONSI), thus precluding the further preparation of an Environmental Impact Statement (EIS).

Also prior to the August 1989 decision becoming final, the Forest Supervisor created a Public Involvement Group, of which Sharps was a member. The task of the Group was to identify public concerns, develop alternative proposals, examine each proposal, and recommend an alternative to the Forest Supervisor to adopt as the final decision which would establish the policy for management of black-tailed prairie dogs on the NNF. The Group unanimously recommended to the Forest Supervisor "alternative 7," one of many alternative developed by the Group. Alternative 7 was adopted by the Forest Supervisor as the management plan for black-tailed prairie dogs on the NNF. Sharps did not appeal in any way this final August 1989 decision.

The August 1989 decision established a range of numbers and acres of prairie dog colonies for each subdivision of the NNF. For the Fall River Ranger District (the west half of the Buffalo Gap National Grasslands), the August decision established a minimum of three and a maximum of eight untreated prairie dog colonies out of a then-current number of eighteen colonies. The August decision also established that the three-to-eight colonies must total between 700 and 1200 acres. The then-current acreage of prairie dog colonies in the Fall River Ranger District was 841. The August decision also required that a one-mile buffer zone be maintained between the untreated prairie dog colonies on the Fall River Ranger District and any private or Indian land adjacent to the district.

In October 1990, the District Ranger for the Fall River Ranger District issued a decision memo implementing the August decision in the Fall River District. The October 1990 decision established eight prairie dog colonies in the district to be maintained at a minimum of 700 acres and a maximum of 1200 acres. This necessitated consolidation of existing colonies, as envisioned by the August decision. The October decision also implemented the one-mile buffer zone mandated by the August decision. Sharps appealed the October decision.

Sharps' amended complaint asserts three claims: (1) that the October decision was issued in violation of National Environmental Policy Act (NEPA) requirements, (2) that the October decision was issued in violation of the National Forest Management Act (NFMA) and the regulations promulgated pursuant thereto, and (3) that the October decision was issued in violation of the Administrative Procedures Act (APA). The Forest Service motion to dismiss raises two issues: (1) whether Sharps has standing to challenge the October decision and (2) whether Sharps has failed in his amended complaint to state any claim upon which relief can be granted.

## DISCUSSION

### A. Standing

▮ The doctrine of standing is tied to the requirement in Article III, section 2 of the United States Constitution that federal courts may only hear "cases" and "controversies." A challenge to a plaintiff's standing is thus a challenge to the subject matter jurisdiction of the court. The standing requirement ensures that there is a real conflict and that the plaintiff is the appropriate person to initiate litigation of that conflict. The standing doctrine ensures these things through imposing three requirements on would-be plaintiffs:

(1) the plaintiff must have suffered an "injury in fact,"

(2) there must be a causal connection between the plaintiff's injury and the defendant's conduct, and

(3) a favorable decision in the case must be "likely" to redress plaintiff's injury.

*Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). It is the plaintiff's burden to establish these elements. *Id.*[1]

The Forest Service argues that Sharps has failed to demonstrate the "injury in fact" requirement. It is important that the Forest Service presents its challenge to Sharps' standing in the context of a motion to dismiss rather than a motion for summary judgment. The burden on Sharps to withstand a motion to dismiss is much different than that imposed by a motion for summary judgment.

 To survive a motion for summary judgment which challenges a plaintiff's standing, the plaintiff must demonstrate specific facts, through affidavit or other competent evidence, in support of his standing to bring the lawsuit. To survive a motion to dismiss, however, the plaintiff need only state "general factual allegations of injury resulting from the defendant's conduct ... for on a motion to dismiss [the court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2137. Therefore, the issue presented by the Forest Service motion to dismiss is whether Sharps' complaint sets forth general factual allegations of injury at the hands of the Forest Service from which the Court can presume the existence of specific facts necessary to support a finding that plaintiff has standing.

To demonstrate an "injury in fact," Sharps must demonstrate "an invasion of a legally-protected interest which is (a) concrete and particularized, ... and (b) 'actual and imminent, not "conjectural" or "hypothetical."'" *Id.* at ——, 112 S.Ct. at 2136 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990)). Sharps has alleged in his amended complaint that he is a certified wildlife biologist who has used the Buffalo Gap National Grasslands for research, study, and recreation. He claims that the October decision will result in a reduction of wildlife diversity on the Fall River Ranger District in general, and specifically, will reduce the numbers of or eliminate the northern swift fox from that area. Sharps states that establishing eight smaller prairie dog colonies results in no colonies of sufficient size in the district to sustain viable populations of the swift fox, 49 percent of the diet of which is composed of black-tailed prairie dogs. Although Sharps does not specifically so state, his citations to authorities in his pleadings reveal that he has studied the northern swift fox in the NNF and published the results of those studies.[2] From these general allegations, it is possible to infer that the establishment of three larger prairie dog colonies, a decision within the discretion of the Fall River District Ranger in his October decision, would be more beneficial to the northern swift fox and would thus avert or minimize the injury to Sharps.

---

1. In addition to the constitutional standing requirements, there are policy-based "prudential" standing requirements which courts have traditionally imposed and standing requirements imposed by the APA. The Court does not discuss the prudential or APA standing requirements because the Forest Service bases its motion to dismiss solely on the aspect of the standing doctrine dictated by the Constitution.

2. In his first administrative appeal, Sharps cites the following studies authored by him:
Hillman, C.N. and J.C. Sharps. 1978. Return of the swift fox to northern Great Plains. Proceedings of South Dakota Academy of Science 57:154–162.
Sharps, J.C. 1989a Progress Report., Rocky Mountain Forest Range and Experiment Station, Rapid City, SD 26 June 1989 Contract # (43–82FT–9–0920) swift fox inventory. Natal den locations of northern swift fox (*Vulpes velox* ) on the Buffalo Gap National Grasslands in South Dakota. 4. pp.
Sharps, J.C. 1989b. Final Report. Rocky Mountain Forest and Range Experiment Station, Rapid City, SD. Contract # (43–82FT–9–0920). swift fox inventory, May 16—August 25. 23. pp.
Uresk, D.W. and J.C. Sharps. 1986. Denning habitat and diet of the swift fox in Western South Dakota. Great Basin Naturalist 46:249–253.
Notice of Appeal of Jon C. Sharps, Nov. 27, 1990, at 8–9.

Sharps has demonstrated the requisite legal interest for purposes of standing in stating his desire to study or observe an animal species along with his past actions involving that animal. *Defenders of Wildlife*, —— U.S. at ——, 112 S.Ct. at 2137 (citing *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)). By alleging that the October decision would adversely affect the presence of that animal species, Sharps has successfully made a general allegation that he would be directly affected by the October decision. *Defenders of Wildlife*, —— U.S. at ——, 112 S.Ct. at 2138 (citing *Morton*, 405 U.S. at 735, 739, 92 S.Ct. at 1366, 1368: and *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). As the Court stated in *Defenders of Wildlife*, "the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist." *Id.*, —— U.S. at ——, 112 S.Ct. at 2139.

Sharps' complaint adequately sets forth general facts from which the Court can presume the existence of specific facts in support of Sharps' standing.. While this would not be sufficient to survive a motion for summary judgment because it does not set forth specific facts demonstrating a direct injury to Sharps, it is sufficient to survive a motion to dismiss at this stage of the litigation. The Forest Service motion to dismiss on the grounds of lack of standing is denied.

## B. NEPA Claim

Count I of Sharps' complaint alleges that the October decision memo violates the National Environmental Policy Act (NEPA) by not following the procedures mandated therein.[3] The motion to dismiss by the Forest Service argues that Sharps' NEPA allegations fail to state a claim upon which relief can be granted. For purposes of a motion to dismiss, the facts as stated in Sharps' amended complaint are assumed to be true.

NEPA requires that an environmental impact statement (EIS) be prepared for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).[4] If agency regulations do not categorically require an EIS for all actions of the type which the agency is con-

---

**3.** The Forest Service alleges that Sharps failed to raise this issue at the administrative level and should be barred from raising it now because Sharps has not exhausted his administrative remedies as to this issue. The Court finds that the issue was preserved for judicial review. In the second level administrative appeal, Sharps states that the Sierra Club, as an intervenor in the first level administrative appeal, raised the NEPA issue. Sharps specifically asks the administrator to address the NEPA issue in the second level appeal, which the administrator failed to do. Furthermore, even if Sharps did not mention NEPA by name, his NEPA claim in this Court is that the Forest Service did not adequately consider the habitat needs of the swift fox in issuing the October decision notice. This factual allegation was raised several times at the administrative level.

**4.** Section 4332 provides in pertinent part as follows:

The Congress authorizes and directs that, to the fullest extent possible: .. (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

42 U.S.C. § 4332(2)(C).

templating, then the agency first prepares an "environmental assessment" (EA) to determine whether a project will have a significant effect on the environment. 40 · C.F.R. § 1501.4[5] If, as a result of the EA the agency determines that its project will significantly affect the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4. However, if after preparing the EA the agency makes a finding of no significant impact (FONSI), then the agency need not prepare an EIS. 40 C.F.R. § 1501.4.

■■■ In the agency of the United States Forest Service, each national forest has its own forest plan prepared in accordance with the National Forest Management Act (NFMA) and each such forest plan is accompanied by an EIS for the forest prepared in accordance with NEPA. The EIS is this instance is "programmatic" because it is issued along with the NFMA-mandated forest plan. *Sierra Club v. Robertson*, 784 F.Supp. 593, 602 (W.D.Ark.1991) (citing *Ventling v. Bergland*, 479 F.Supp. 174, 176 (D.S.D.), *aff'd without opinion*, 615 F.2d 1365 (8th Cir. 1979)). A programmatic EIS which is comprehensive and well-prepared obviates the need for a subsequent site- and project-specific EIS unless new and significant environmental impacts arise which were not evaluated within the programmatic EIS. *Robertson*, 784 F.Supp. at 602–03 (citing *Minn. Pub. Interest Research Group v. Butz*, 498 F.2d 1314, 1323 n. 29 (8th Cir.1974) (*en banc*); and 40 C.F.R. § 1502.9(c)(1)). The Forest Service may prepare an EA for site-specific projects to determine whether a supplement to the programmatic EIS is required. 40 C.F.R. § 1508.9(a); and *Robertson*, 784 F.Supp. at 603.

■■■ NEPA imposes only procedural requirements. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). NEPA does not dictate a substantive environmental result. *Marsh v. Oregon Natural Resources*

*Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989). The policy behind NEPA is to ensure that an agency has at its disposal all relevant information about environmental impacts of a project before the agency embarks on the project. *Id.* at 371–72, 109 S.Ct. at 1858; and *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 558, 98 S.Ct. at 1219.

Sharps maintains that the October decision memo violates NEPA because the decision represents "major federal action" having a significant environmental impact and, therefore, NEPA requires the preparation of an EIS or at least an EA. Sharps states that the October decision *and the August decision to which it is tiered,* failed to evaluate site-specific information regarding non-game vertebrate species associated with the black-tailed prairie dog. Sharps also states that the October decision is inadequate under NEPA because it failed to analyze the effects of past management of black-tailed prairie dogs, the effects of future reductions of black-tailed prairie dogs, the effects of consolidation of black-tailed prairie dog colonies, and the effects of black-tailed prairie dog management on the habitats of associated species.

**1. Standard of Review**

■■■ Agency decisions not to prepare an environmental impact statement based on a FONSI are reviewed under the arbitrary and capricious standard. 5 U.S.C. § 706(2)(A); *Marsh*, 490 U.S. at 377–78, 109 S.Ct. at 1861; and *Audubon Soc. v. Dailey*, 977 F.2d 428, 433 (8th Cir.1992). The reviewing court must determine whether the agency considered relevant factors in deciding to forego an EIS and whether the agency committed a clear error of judgment. *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)); *Dailey*, 977 F.2d at 434. Four factors have been identified by the District of Columbia Circuit to be exam-

---

5. An environmental assessment is a study of the proposed action, alternatives to the proposed action, and the environmental impacts of the action and the alternatives in order to aid the agency in determining whether the proposed action will

significantly affect the environment. 40 C.F.R. § 1508.9. "Significantly" requires the agency to consider the impact of the proposal in several contexts as well as the intensity, or severity, of the impact. 40 C.F.R. § 1508.27.

ined in determining whether an agency decision not to prepare an environmental impact statement was arbitrary and capricious:

1. whether the agency took a "hard look" at the problem;

2. whether the agency identified the relevant areas of environmental concern;

3. as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

4. if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Dailey*, 977 F.2d at 434 (quoting *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 681–82 (D.C.Cir.1982)).

 However, the situation where an agency concedes that NEPA applies and concludes that an EIS is not required based on a FONSI is distinguishable from the situation where an agency determines an EIS is not required because no "major federal action" is involved. *Goos v. Interstate Commerce Comm'n*, 911 F.2d 1283, 1292 (8th Cir.1990). The former situation presents a factual question reviewed pursuant to the arbitrary and capricious standard while the latter situation presents a legal question of the applicability of NEPA and is reviewed under the reasonableness standard. *Id.* The Court concludes that the October decision memo did not constitute "major federal action" triggering the NEPA requirements and, thus, the failure of the Forest Service to prepare an EIS in connection with the October decision memo is not fatal to that decision.

### 2. What Constitutes "Major Federal Action" Sufficient to Trigger NEPA Requirements?

██ Before an agency can be required to determine whether its proposed action will significantly affect the environment, the agency must first determine whether its action constitutes "major federal action" which triggers the applicability of NEPA procedures. In *Goos v. Interstate Commerce Comm'n*, 911 F.2d 1283, 1293–97 (8th Cir. 1990), the Eighth Circuit outlined the analy-

sis for determining whether agency action constitutes "major federal action." The decisive factor in this determination is the discretion accorded the agency actor in carrying out the proposed project. *Id.* at 1295. The greater the degree of discretion involved, the more likely that the project constitutes "major federal action" and, conversely, the less discretion granted, the more likely the project does not constitute such action. *Id.* at 1294–96.

In *Goos*, the I.C.C. had no discretion to deny permits for use of abandoned railway lines as hiking trails when the parties voluntarily agreed to such use. *Id.* at 1295. The *Goos* court therefore concluded that the issuing of a permit by the I.C.C. allowing use of abandoned railway lines as trails was merely ministerial and did not constitute "major federal action" triggering the NEPA requirements. *Id.* at 1295–97. The reasoning for excluding ministerial acts from NEPA requirements is that the primary purpose of NEPA is to aid agency decisionmaking and when the agency has little or no discretion as to what its decision will be, it would be futile to require the agency to compile environmental data which cannot ultimately affect the agency decision. *Id.* at 1296 (citing *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir.1988); *Minnesota v. Block*, 660 F.2d 1240, 1259 (8th Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982); *South Dakota v. Andrus*, 614 F.2d 1190, 1193 (8th Cir.), *cert. denied*, 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); and *Milo Community Hosp. v. Weinberger*, 525 F.2d 144, 147 (1st Cir.1975)).

In the instant case, after the August 1989 decision notice, the Ranger in the Fall River District was required to consolidate eighteen existing prairie dog colonies totalling 841 acres to form three to eight untreated prairie dog colonies totalling 700 to 1200 acres. The August decision also required the Fall River District Ranger to attempt to maintain one-mile buffer zones between untreated prairie dog colonies and private or Indian lands. Thus, the discretion of the Fall River Ranger was limited by the parameters described by the August decision notice.

The October 1990 decision memo established eight prairie dog colonies to be maintained at a minimum of 700 acres, within the parameters established by the August decision. Sharps' complaints regarding the October decision memo include allegations that the consolidation of the prairie dog colonies and the maintenance of the one-mile buffer zones between colonies and private or Indian lands interrupts the natural mosaic pattern of such colonies, adversely affecting the habitat for non-game vertebrate species associated with the black-tailed prairie dog. The Fall River District Ranger has no power to address these complaints as they were not within the discretion accorded him under the August decision.

Requiring the Fall River District Ranger to prepare an EIS or an EA on the environmental impacts of consolidation and the one-mile buffer zone would be futile because they could not affect his ultimate decision. Accordingly, the Court concludes that the October decision memo did not constitute "major federal action" triggering NEPA requirements for the reason that the Fall River District Ranger had no discretion to accommodate the concerns raised by Sharps. Sharps should have appealed the August decision memo if he wanted these issues addressed.

### 3. When is a Supplemental Environmental Impact Statement Required?

Although the Court has concluded that NEPA requirements did not apply to the October decision memo, the Court finds that even if those requirements did apply, the Fall River District Ranger complied with those requirements in issuing the October decision.

■ The general rule is that once an EIS is prepared for a project, the project can proceed without the necessity of a supplemental EIS for each stage of the project. *Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 447 (7th Cir.1990); *Sierra Club v. Robertson*, 784 F.Supp. 593, 603 (W.D.Ark. 1991). A supplemental EIS at a later stage of the project is required *only* when new circumstances arise which will have a significant effect on the human environment *which was not already considered in the original EIS*. 40 C.F.R. § 1502.9(c); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989); *Cronin*, 919 F.2d at 449; *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1178 (9th Cir.1990); *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990) (quoting *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir.1987)); and *Robertson*, 784 F.Supp. at 603.[6] When plaintiffs urge a supplemental EIS should be conducted based on effects already adequately considered by the original EIS, a supplemental EIS is not required. *Cronin*, 919 F.2d at 449; *Headwaters, Inc.*, 914 F.2d at 1178; *Hickory Neighborhood Defense League*, 893 F.2d at 63; and *Texas v. United States Forest Serv.*, 654 F.Supp. 296, 298 (S.D.Tex.1987).

■ The burden is on the plaintiff to show that grounds exist requiring the preparation of an EIS. *Robertson*, 784 F.Supp. at 606. In *Robertson*, the district court held that when the timber cutting proposed in a site-specific project did not differ significantly from the timber cutting anticipated and evaluated in the programmatic EIS, no supplemental site-specific EIS was required. *Id.* See also *Cronin*, 919 F.2d at 449 (holding supplemental EIS not necessary for site-specific timber sale where programmatic EIS considered effects of both clear-cutting and group selection and site-specific project authorized group selection); *Headwaters, Inc.*, 914 F.2d at 1180 (holding that a supplemental EIS for a site-specific timber sale was not required where programmatic EIS considered effect of timber sales on northern spotted owl and site-specific project would not have an effect on owl habitat not already considered in the programmatic EIS); and *Texas v. United States Forest Service*, 654 F.Supp. at 297–98 (holding supplemental EIS not necessary for site-specific infestation and reforestation program where impacts of site-

---

**6.** Forest Service regulations are consistent with the case law. Under these regulations, a supplemental EIS is required only when a change to an existing plan is proposed which "would result in a significant change in the plan." 36 C.F.R. § 219.10(f).

specific program were the same as those considered in the programmatic EIS).

■ Under the facts of this case, a programmatic EIS was in place for the entire forest. Prior to the August decision notice becoming final, an EA was prepared and the agency determined that no supplemental EIS to the programmatic EIS should be prepared because the August decision notice would have no significant environmental impacts not already considered and evaluated in the programmatic EIS. Sharps did not appeal this finding of no significant impact (FONSI) with regard to the August decision notice, so that conclusion is beyond reproach in this lawsuit. What is at issue in this lawsuit is whether the October decision memo will have a significant environmental impact not already considered and evaluated in the EA prepared in connection with the August decision notice.

The EA prepared in connection with the August decision notice considered and evaluated the history of management of the black-tailed prairie dog on the Nebraska National Forest, the environmental effects that the proposed use of rodenticides would have, the effects the project would have on wildlife species associated with the black-tailed prairie dog, the effects that the project would have on the habitat of species associated with black-tailed prairie dogs, and whether the project would involve an irreversible or irretrievable commitment of resources. Furthermore, a biological assessment of the cumulative effects of the project on threatened and endangered species was prepared in connection with the EA and was submitted to the United States Fish and Wildlife Service for comment. As part of the scoping process for the August decision, a Public Involvement Group was formed which identified public interests, formed alternative proposals, and *unanimously* voted to recommend to the Forest Supervisor the alternative which became the basis of the August decision. Sharps himself was a member of the Public Involvement Group.

Sharps urges the necessity of an EIS for the October decision memo based on the lack of site-specific information regarding nongame vertebrate species associated with the black-tailed prairie dog, the failure to look at the effects of past management of black-tailed prairie dogs, the effects of future reductions of black-tailed prairie dogs, the effects of consolidation of prairie dog colonies, and the effects of management of the black-tailed prairie dog on the habitat of associated species. All of the factors upon which Sharps urges the necessity of an EIS for the October decision were evaluated in the EA prepared for the August decision. The October decision memo cites as reasons for foregoing an EA or an EIS the fact that the October decision would have no significant environmental effects and that an EA had already been done in connection with the August decision. While perhaps not precisely stated, it seems clear that the Fall River District Ranger did not prepare an EA or an EIS for the October decision because he found that the October decision would not involve any significant environmental impacts not already considered by the EA prepared for the August decision.

The Fall River District Ranger's decision that an EA or EIS was not necessary for the October decision memo was not an arbitrary or capricious decision. Sharps has pointed to no significant environmental effect of the October decision which was not foreshadowed by and considered in the August decision. Therefore, assuming NEPA requirements were applicable to the October decision, Sharps' NEPA claim is denied for the additional reason that Sharps has failed to allege that the October decision will entail new environmental impacts not adequately considered by the EA prepared for the August decision. In short, Sharps has failed to allege the necessary factual predicate which would mandate a supplemental EA or EIS.

## C. NFMA Claim

Count II of Sharps' complaint states that the October decision violates the National Forest Management Act (NFMA) in two ways. First, Sharps argues that the decision does not provide for maintenance of viable populations of native vertebrate species or for diversity of plant and animal communities in violation of 16 U.S.C. § 1604(g), and 36 C.F.R. §§ 219.19, 219.27, and 219.36 (1992).

Second, Sharps argues that the October decision implements the August decision and that the August decision violates the provision of the Forest Plan for the Nebraska National Grasslands which mandates that 45 percent of the forest be managed with a wildlife emphasis, among other things.

■ Sharps' second NFMA allegation is purely derivative of the August decision. The only fault found with the October decision is that it implements the allegedly inadequate August decision. Inasmuch as the August decision is beyond the scope of this lawsuit, Sharps' second NFMA allegation must be dismissed.

■ Sharps' first NFMA allegation is also without merit. Sharps states that the October decision violates regulations of the Forest Service promulgated pursuant to authority granted at 16 U.S.C. § 1604(g) and published at 36 C.F.R. §§ 219.19, 219.27, and 219.36. Section 219.19 requires that "wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the *planning area.*" 36 C.F.R. § 219.19 (emphasis added). "Planning area" is defined as "the area of the National Forest System covered by a *regional guide* or *forest plan.*" 36 C.F.R. § 219.3 (emphasis added). The Forest Service is divided into three administrative levels: national, regional, and forest. 36 C.F.R. § 219.4(a). The Nebraska National Forest, which is at the "forest level," is within the larger Rocky Mountain Region—the "regional level." It is clear that section 219.19 does not apply to plans adopted below the forest level because it only applies to "planning areas." Planning areas are only those areas covered by a forest plan or regional plan. The October decision is a *district* plan, not a forest or regional plan. Therefore, section 219.19 does not apply to the October decision.

Likewise, section 219.27 does not apply to plans adopted at the district level. Section 219.27 sets forth requirements to "guide the development, analysis, approval, implementation, monitoring and evaluation of *forest plans.*" 36 C.F.R. § 219.27. "Forest plans" exist at the next administrative level up from "district plans." The October decision is a

*district* plan. Therefore, the terms of section 219.27 do not apply to the October decision.

The third regulation which Sharps argues is violated by the October decision, 36 C.F.R. § 219.36, does not exist. The last section in Part 219 of Volume 36 in the Code of Federal Regulations is section 219.29. The Court will not speculate as to what Sharps had in mind when he cited "section 219.36." It is enough to observe that Sharps has failed to state any proposal encompassed by the October decision which is in violation of NFMA or regulations promulgated pursuant to NFMA. Accordingly, Sharps' NFMA claim will be dismissed as well.

**D. Administrative Procedures Act Claim**

Count III of Sharps' complaint alleges a violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2) in that the October decision was arbitrary and capricious, made with inadequate information or analysis, and made in violation of NEPA and NFMA. This claim is not really a separate claim, but is derivative of the substantive claims asserted under NEPA and NFMA. Accordingly, the APA claim falls with the defeat of the NEPA and NFMA claims.

**CONCLUSION**

Reading between the lines of Sharps' complaint, it is clear that his concerns could have and should have been expressed in the context of an appeal of the August 1989 decision notice. However, Sharps failed to appeal the August decision. This is particularly inexcusable in view of the fact that Sharps was a member of the Public Involvement Group which unanimously proposed the alternative which was ultimately adopted in the August decision: Sharps had first-hand knowledge of what the decision entailed, when it would become final, and what considerations were part of the decision.

■ The requirement that administrative remedies be exhausted before judicial review is allowed is not "an excuse to avoid answering the issues and concerns" of litigants as Sharps so characterized the requirement in his second-level administrative appeal. Rather, the exhaustion doctrine is designed

to ensure that administrative agencies be allowed to exercise the authority granted to them, that the administrative process is efficient, and that the agency be free from judicial intervention until the agency itself has had an opportunity to address its own errors. *Sierra Club v. Robertson,* 784 F.Supp. 593, 597–98 (W.D.Ark.1991). By not appealing the August decision and attempting to attack that decision through an appeal of the October 1990 decision memo, Sharps would frustrate the goals informing the exhaustion doctrine. Sharps points to no grounds upon which the Court could excuse his failure to exhaust his remedies as to the August decision. Therefore, the exhaustion doctrine must bar any attacks upon that decision, even if such attacks are nominally against the October decision.

Sharps' NEPA claim fails because he has failed to show how the October decision presents environmental impacts not identified and considered in the August decision. Sharps' NFMA claim fails because Sharps has failed to show how the October district plan is in violation of regulations applying only to forest and regional plans. Accordingly, the Forest Service motion to dismiss is granted.

### JUDGMENT

In accordance with the order filed March 26, 1993, it is hereby

ORDERED that the United States Forest Service and the individual defendants named in this action shall have judgment against Jon C. Sharps. The decision of the Forest Service upholding the October 1990 decision of the District Ranger for the Fall River Ranger District is affirmed in all respects.